**2022 IL 125722**

# IN THE

# SUPREME COURT

# OF

# THE STATE OF ILLINOIS

_____

(Docket No. 125722)

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v.
ANDREW SALAMON, Appellant.

*Opinion filed April 21, 2022.*

JUSTICE NEVILLE delivered the judgment of the court, with opinion.

Chief Justice Anne M. Burke and Justices Theis, Overstreet, and Carter concurred in the judgment and opinion.

Justice Michael J. Burke specially concurred, with opinion, joined by Justice Garman.

**OPINION**

¶ 1  Following a jury trial in the circuit court of Cook County, defendant Andrew Salamon was convicted of first degree murder, armed robbery, and burglary and sentenced to an aggregate prison term of 33 years. Defendant appealed, arguing that

the circuit court erred in denying his pretrial motion to suppress his inculpatory statement because it was obtained in violation of his constitutional and statutory rights. The appellate court rejected defendant's arguments and affirmed his conviction. 2019 IL App (1st) 160986-U. This court granted defendant's petition for leave to appeal. Ill. S. Ct. R. 315 (eff. Oct. 1, 2019). For the following reasons, we affirm the judgment of the appellate court.

¶ 2                                   I. BACKGROUND

¶ 3        In the early morning hours of October 4, 2009, police officers responded to a burglar alarm at O'Lanagan's bar on the north side of Chicago. Robert Gonzalez, the owner of the bar, was found lying between two parked cars in the parking lot behind the bar. Gonzalez had suffered multiple injuries and was transported to the hospital, where he died 15 hours later. During the police investigation of the crime, defendant and another person named Raymond Jackson became suspects. Defendant was ultimately arrested approximately two years later and charged with first degree murder based on a theory of accountability, armed robbery, and burglary.[1]

¶ 4        Prior to trial, defendant filed a motion to suppress a statement he made to the officers investigating Gonzalez's death and to an assistant state's attorney. Defendant's motion asserted that any and all statements made by him were elicited in violation of his constitutional rights under the fourth, fifth, sixth, and fourteenth amendments to the United States Constitution (U.S. Const., amends. IV, V, VI, XIV), the Illinois Constitution (Ill. Const. 1970), and his statutory right to communicate with an attorney or family member under section 103-3 of the Code of Criminal Procedure of 1963 (725 ILCS 5/103-3 (West 2012)).

¶ 5                               A. Suppression Hearing

¶ 6        At the hearing on the motion to suppress, defendant testified that he was contacted by police officers on November 15, 2010, approximately one year after Gonzalez died. On that date, he received a telephone call from a detective who

---

[1]The record does not reflect whether Jackson was ever charged or tried for any crimes related to Gonzalez's death.

indicated he had "some routine questions" about an unspecified matter. Defendant voluntarily went to the police station with a friend, Apolonio Retama.

¶ 7    During that conversation with the detectives, defendant was not handcuffed or given *Miranda* admonishments. See *Miranda v. Arizona*, 384 U.S. 436 (1966). Detectives Timothy Thompson and John Gillespie began asking questions about Jackson regarding what they described as a "serious matter." When defendant learned that they were investigating a murder, he informed them that he wanted to speak with an attorney before talking to them any further. The detectives told him he did not need an attorney, but when he insisted, they told him that he was free to go. Defendant estimated that this encounter with the detectives lasted approximately 15 minutes.

¶ 8    Nearly a year later, defendant was pulled over by two police cars as he was driving home from work in the early evening of November 9, 2011. When he stopped his vehicle, several officers surrounded him with their guns drawn and ordered him out of his car. Defendant complied and was then handcuffed and placed in the back of one of the police cars. The two detectives who had questioned him a year earlier were also in the police car. The detectives did not advise him that he was under arrest, and he asked why he had been stopped. According to defendant, the detectives told him " 'the games are over with' " and that it was his " 'last chance to cooperate' " and they could " 'do this the easy way or the hard way.' " The prosecutor objected on the ground that "[t]here is nothing [in defendant's motion] about coercion or anything else." Defense counsel responded that the previous testimony was not offered "as coercion" and that he was asking defendant "what happened when he got in the [police] car." The trial court overruled the objection.

¶ 9    Defendant further testified that, as soon as he got in the police car, he told the detectives that he wanted to speak to a lawyer. The detective drove him to the police station, put him in an interrogation room, and then advised him of his *Miranda* rights. Defendant again repeated that he wanted to speak to a lawyer, but he was not permitted to use a telephone to contact an attorney or any members of his family who could arrange for counsel.

¶ 10    According to defendant, he remained handcuffed to the wall in the interrogation room overnight except on the three or four occasions when he was escorted to use

the restroom. During that time, he was provided with food, water, and contact lens solution. Defendant acknowledged that, when he told the detectives he did not wish to speak to them without an attorney present, they stopped questioning him and left the interrogation room. He stated, however, that the officers who escorted him to and from the restroom urged him to cooperate with the investigation.

¶ 11       Defendant further testified that he repeatedly requested a telephone call so that he could contact an attorney, but none of the officers permitted him the use of a telephone. On November 10, 2011, after spending approximately 24 hours alone and handcuffed to a wall in the interrogation room, while his repeated requests for a phone call were ignored, he started crying and pounding on the walls and door. Defendant again requested a telephone call to contact an attorney and his mother so she could call a lawyer. When a police officer opened the door, defendant said that he wanted to speak to Detectives Thompson and Gillespie. Shortly thereafter, Detectives Thompson and Gillespie reentered the room, but they informed him that he would have to "wait" for a phone call.

¶ 12       Eventually, defendant agreed to speak with the detectives. He acknowledged that he reinitiated contact with the detectives and, after he was again admonished of his *Miranda* rights, he provided a statement. Defendant subsequently provided another statement to an assistant state's attorney, who also advised him of his *Miranda* rights.

¶ 13       The State called Detective Timothy Thompson, who substantially confirmed defendant's description of the interview at the police station in November 2010. Thompson testified that he was present when defendant was arrested on November 9, 2011, in connection with Gonzalez's murder. Following the arrest, defendant was transported to the Area North police station and, shortly after 6 p.m., defendant was placed in an interview room. Thompson further testified that he activated the electronic recording system and immediately advised defendant of his *Miranda* rights. After being advised of his rights, defendant stated that he wanted to speak with an attorney. At that point, Thompson and his partner ceased interviewing defendant and left the room.

¶ 14       According to Thompson, he did not ask defendant any questions or speak to him about the homicide until sometime around 5:15 p.m. the following day, when defendant reinitiated contact. Thompson confirmed that defendant was provided

with food, water, contact lens solution, and restroom breaks while he was detained in the interview room. Thompson stated that he personally escorted defendant to the restroom at least once, but he denied that he spoke to defendant about the case on that occasion.

¶ 15    Thompson stated that sometime after 5 p.m. on November 10, 2011, Detective Moriarty advised him that defendant had been kicking the door of the interview room. When he and Gillespie entered the room, defendant stated that he was "ready to talk." Thompson testified that he informed defendant he would have to be given his *Miranda* warnings again because he had declined to be interviewed without counsel present. After defendant was again admonished, he gave the detectives a statement about Gonzalez's murder. Sometime thereafter, defendant also provided another statement to Assistant State's Attorney Miki Miller.[2] Thompson also testified that it was "procedure" at the Area North police station that arrestees are not "normally" provided telephone access until "after the completion of the booking process." Thompson confirmed that defendant was not booked until after he had provided his statement to them and to Assistant State's Attorney Miller.

¶ 16    On cross-examination, Thompson admitted that, after defendant invoked his right to counsel, he was placed in a locked interview room. In response to defense counsel's question whether defendant had requested to make a telephone call while he was detained, Thompson said that he "[did not] specifically recall" but that defendant could have done so.

¶ 17    Thompson acknowledged that defendant did not have any access to a telephone from the time of his arrest and during the entirety of his detention in the interrogation room. When defense counsel further questioned Thompson about defendant's lack of access to a telephone, the prosecutor objected based on lack of relevance. Defense counsel responded that defendant "was told he had a right to a lawyer" and that counsel was "just trying to find out how he is supposed to get that lawyer, what that right entails." The State's objection was overruled.

_____

[2]Thompson testified that the electronic recording equipment remained activated throughout defendant's 24-hour detention in the interrogation room, but no footage of that time period has been provided to the court. The record on appeal includes only the videorecording of defendant's statement to Assistant State's Attorney Miller.

¶ 18    Later, defense counsel asked whether defendant had been handcuffed to the wall, and Thompson answered, "[o]n some occasions, yes." At that point, the prosecutor again objected on the ground of relevance, stating that "[t]his is not a motion alleging coercion." Defense counsel explained that "it [was] relevant that 24 hours after—25 hours after he asks for a lawyer, he is physically incapacitated from getting a lawyer not only by being locked in a room but being handcuffed to a wall." The trial court overruled the State's objection. Detective Thompson then admitted that, while defendant was locked in the interrogation room, he did not have any way to speak to a lawyer.

¶ 19    During his closing argument in support of the motion to suppress, defense counsel argued that defendant had invoked his right to counsel but had "no means of getting an attorney. So the officer telling him that he has a right to an attorney *** is absolutely meaningless if he has *** no means of getting an attorney or *** calling anyone to get him an attorney."

¶ 20    In response, the prosecutor argued that defendant's rights under the fifth amendment had not been violated because all questioning stopped after he invoked his right to counsel. She noted that defendant had acknowledged he was given food, water, contact lens solution, and restroom breaks and that he later reinitiated contact with the detectives. In particular, the prosecutor referenced Thompson's testimony that arrestees were permitted access to a telephone after the booking process, and she maintained that the detectives "did exactly what they were supposed to do *** exactly what the constitution calls for." She posited that the "police have the right to their own procedures as to who gets to go where and when because they are in custody." In addition, the prosecutor contended that defendant had not met his burden to suppress his statement. And she specifically argued that "we have met our burden to show that [the statement] was indeed voluntary."

¶ 21    In rebuttal, defense counsel argued that "*Miranda* requires that *** if [defendant] asks for a lawyer, he be given a lawyer during questioning. He asked for a lawyer, and he [was] given no means whatsoever to obtain a lawyer."

¶ 22    In ruling on defendant's motion to suppress, the circuit court specifically considered defendant's age and the fact that he was employed at the time of his arrest. The court also referenced the evidence presented at the hearing, including defendant's earlier police interview in 2010 and the circumstances surrounding his

detention following arrest. In addition, the court noted that the testimony of Detective Thompson "mirrors in large part" that of defendant.

¶ 23    Ultimately, the circuit court denied the motion to suppress, finding that defendant's statement was voluntary because he had been advised of his rights pursuant to *Miranda* and waived those rights when he reinitiated contact with the detectives. The court observed that "the police were slow in providing a phone call" but found that they had not engaged in improper conduct in obtaining defendant's statement.

¶ 24                                  B. Trial

¶ 25    At defendant's jury trial, the State's theory of the case was that Jackson had been injured in a fight at O'Lanagan's and sought revenge against the bar's owner, Gonzalez, as well as money to pay his resulting medical bills. Jackson enlisted defendant in a plan to burglarize the bar, and Gonzalez was killed during the commission of the crime.

¶ 26    Gonzalez's friend, Sam Kelfino, who was helping remodel O'Lanagan's exterior, testified that he had a confrontation with Jackson in September 2009, about a month before the murder. Kelfino was standing near the bar's entrance when Jackson, whom Kelfino described as the "neighborhood bully," approached and ordered Kelfino to move. When Kelfino ignored him, Jackson threatened to punch Kelfino in the mouth. Kelfino, a former professional boxer, punched Jackson, knocking him unconscious. When Jackson regained consciousness, he attempted to enter O'Lanagan's bar, but Gonzalez laughed at him and refused to let him inside. Jackson eventually had to be taken away in an ambulance. About a week later, Jackson called Kelfino and asked him to "go in cahoots with him" and falsely claim that the fight had occurred inside the bar so that Jackson could file a lawsuit and recover money. Kelfino declined to help Jackson.

¶ 27    Jose Santos, an acquaintance of Jackson's for 10 years, testified that on an evening in late September 2009, the two men went to a bar near O'Lanagan's. Jackson was looking for Kelfino and had concealed a pipe with tape wrapped around the handle in his shirt sleeve.

¶ 28        Santos saw Jackson again on the evening of the murder. Jackson arrived at Santos's house in a car driven by one of Jackson's friends, "Andrew," whom Santos identified at trial as defendant. Santos got in the backseat, and the three men discussed a plan to burglarize O'Lanagan's. The men agreed that Santos would "watch out," while Jackson took a box of money from the bar's basement and defendant broke into the slot machines. Defendant told Santos that he had a crowbar to assist with the crimes. They expected to recover around $5000 from the robbery. Although he initially agreed to participate, Santos ultimately changed his mind and did not accompany the other two men to O'Lanagan's.

¶ 29        When initially questioned by police in November 2009, Santos said that a white male in his early twenties had been driving the car with Jackson on the night of the murder. After police spoke with defendant, they questioned Santos again in February 2010 and showed him a photo array containing pictures of six different men, including defendant. Santos identified defendant's photo as the man driving the car.

¶ 30        Retama, defendant's friend of 15 years, testified that defendant called him in the fall of 2010 and said that he had done "something bad." Retama invited defendant over to discuss the matter. When defendant arrived, he was visibly upset and said he thought he was "going down for murder." Defendant then recounted to Retama that he had agreed to help Jackson rob a bar. He explained that Jackson had gotten into a fight at the bar and wanted to get even with the bar's owner, who had thrown him out. During the course of the burglary, the men encountered the bar's owner, who grabbed defendant's shoulder. Defendant then punched the owner in the head, and Jackson proceeded to beat the owner to death with a pipe.

¶ 31        Retama encouraged defendant to turn himself in. Retama accompanied defendant to the police station, where he waited for several hours while defendant spoke with police. When defendant finished speaking with police, he looked scared, and his hands were shaking. Retama then drove defendant and himself back to Retama's house.

¶ 32        Other evidence established that Gonzalez was last seen alive around 3:30 a.m. on October 4, 2009. At that time, Gonzalez was inside the bar. The bar's burglar alarm was activated at 4:23 a.m., indicating that Gonzalez left the bar at around that

- 8 -

time. But three minutes later, the rear door was breached, and the alarm was triggered. The alarm company notified the police of the alert.

¶ 33    Officer Emmert Gouthier responded to the scene and found that the bar's front door was locked and secured but that the back door was unlocked and showed no sign of forced entry. Gouthier and another officer searched the bar and found no one inside. When they exited the rear door, they heard a noise and followed a trail of blood to Gonzalez, who was lying in the nearby parking lot. Gonzalez was unresponsive and bleeding from severe injuries. Gonzalez was transported to the hospital, where he later died from his injuries.

¶ 34    A medical examiner testified that Gonzalez's injuries included three large lacerations on the back of his head and a recent bruise on his forehead, which "was a discreet impact though not as hard as the ones on the back of the head." The lacerations had been made with a heavy but narrow object, such as a pipe. The object fractured Gonzalez's skull and injured his brain, resulting in his death.

¶ 35    On the day of the murder, detectives spoke with Kelfino, who identified Jackson as someone who had been angry with Gonzalez and was looking for reimbursement for his hospital bills. The detectives spoke with Santos shortly thereafter.

¶ 36    In January 2010, detectives obtained Jackson's cell phone records. Cell phone data placed Jackson's phone in the vicinity of O'Lanagan's around the time of the murder. Jackson's phone records led police to a number of potential witnesses, and they interviewed more than 50 people over the course of their investigation.

¶ 37    One of the phone numbers in Jackson's records belonged to defendant. After Santos identified defendant's photo, the detectives sought to interview him in November 2010. At their request, defendant came to the police station and spoke with the detectives. Retama accompanied defendant to the station but was not interviewed at that time. About a year later, the detectives arrested defendant and took him to the police station. He eventually gave a videorecorded statement to Assistant State's Attorney Miller.

¶ 38    Defendant's videorecorded statement to Miller was played for the jury during the State's case-in-chief. In that video, defendant stated that he met Jackson through friends and that they had spoken only five or six times before October 2009. On the

night of the murder, the two men went out for drinks. When defendant picked Jackson up, he saw Jackson wrapping a metal pipe with black tape, which Jackson said was needed "for protection." Jackson told defendant that he was angry at Gonzalez for laughing at him after the altercation at O'Lanagan's. Jackson proposed breaking into the bar after it closed that evening. Defendant stated that he was to act as a lookout while Jackson went inside and took money from the bar's poker machines. Jackson estimated that they would walk away with $50,000, and defendant agreed to participate because he needed the money.

¶ 39        According to defendant's statement, he went to O'Lanagan's, had a drink, and looked around for cameras as preparation for the burglary. Jackson had suggested that he knew someone who could help with the crime, and he directed defendant to drive to Santos's house. Santos got in the back seat of the car, and they explained the burglary plan to him, but Santos ultimately decided not to participate.

¶ 40        Defendant and Jackson waited outside O'Lanagan's, watching patrons depart. After the bar closed, Jackson approached the rear door of the building, which was locked, and saw Gonzalez inside. Jackson told defendant that he could "persuade" Gonzalez to give them the keys to the bar. Defendant stated that when Gonzalez came out Jackson approached him and began attacking him with the pipe. From the intensity of the attack, defendant could tell that Jackson had a personal grudge against Gonzalez. After Jackson stopped beating Gonzalez with the pipe, he dragged him in between two cars in the parking lot and took the keys from Gonzalez's pocket.

¶ 41        Defendant stated that he used the keys to open the rear door of the bar, but he immediately noticed the burglar alarm and decided not to go inside. When they left the scene, Jackson warned defendant to keep quiet about the crime. As they were driving away, Jackson cleaned the pipe with baby wipes and threw it in a garbage can, and defendant tossed the keys out of his window. Defendant subsequently cleaned his car to remove blood from the front passenger seat Jackson had occupied. Defendant last spoke to Jackson two days later when Jackson called to make sure that defendant was "keeping his mouth shut."

¶ 42        Defendant further stated that, about a year later, he learned that the police wanted to speak with him. He told Retama about the incident, and Retama accompanied him to the police station. Defendant insisted that he never touched

Gonzalez, and he stated that he did not recall telling Retama that he had punched Gonzalez. Defendant explained that, if he had said that to Retama, he must have done it to avoid looking "like a bitch."

¶ 43 Defendant chose not to testify and rested without presenting witnesses. During closing argument, defense counsel acknowledged that defendant had participated in the scheme to burglarize O'Lanagan's bar, but he argued that defendant was not accountable for Gonzalez's murder because it was not committed in furtherance of the planned burglary. Rather, counsel argued, Jackson had planned to murder Gonzalez in revenge, but defendant did not know about Jackson's murder plan because he did not know Jackson very well when he agreed to take part in a burglary.

¶ 44 The jury found defendant guilty on all counts. He subsequently filed a motion for a new trial in which he asserted, *inter alia*, that the circuit court erred in denying his motion to suppress. The circuit court denied defendant's motion for a new trial and imposed an aggregate sentence of 33 years for first degree murder, armed robbery, and burglary.

¶ 45                                             C. Appellate Court Decision

¶ 46 On appeal, defendant challenged the denial of his motion to suppress. In his brief before the appellate court, defendant specifically argued that the erroneous admission of his involuntary statement was "preserved" by his counsel's "filing [of] a pre-trial motion to suppress his statement on both statutory and constitutional grounds *** and by including the denial of the motion in a post-trial motion." The State's brief did not counter that argument or respond to it in any way.

¶ 47 The appellate court addressed the issue on the merits and affirmed defendant's conviction, holding that his statement was voluntary and that, even if it had been involuntary, any error in its admission was harmless. 2019 IL App (1st) 160986-U, ¶¶ 60-64. In reaching this conclusion, the appellate court observed that the length of defendant's prestatement detention and the denial of his requests for a phone call are relevant but not determinative factors when considering the totality of the circumstances of a defendant's statement. *Id.* ¶ 60. In addition, the appellate court noted that several factors distinguish this case from the decisions in *Haynes v.*

*Washington*, 373 U.S. 503 (1963), and *People v. Sanchez*, 2018 IL App (1st) 143899. 2019 IL App (1st) 160986-U, ¶ 60.

¶ 48 In particular, the appellate court pointed to the following facts: defendant was informed of his *Miranda* rights while he was in police custody and evidenced an understanding of his rights by first invoking his right to counsel and then by waiving his rights after reinitiating contact with police; defendant's use of a telephone was never conditioned upon his cooperation with the detectives—he was simply told he had to "wait" for a phone call; although defendant was not provided access to a telephone during his prestatement detention, Detective Thompson explained it was Area North's general practice not to provide arrestees with telephone access until after the booking process was completed; defendant was not "booked" until after he provided statements to detectives and the assistant state's attorney, but he had not argued that his "booking" was purposely delayed in order to prevent him from making a phone call. *Id.*

¶ 49 In addition, as to the applicability of section 103-3(a), the appellate court noted that the term "reasonable time" is not defined in the statute and would only be one of the relevant factors in the totality of the circumstances regarding the voluntariness of defendant's statement. *Id.* ¶ 61.

¶ 50 The appellate court determined that even if the detectives violated defendant's rights under section 103-3(a) (725 ILCS 5/103-3(a) (West 2008)) by failing to provide him access to a telephone during his prestatement detention, the totality of the circumstances does not support a finding that his statement was involuntary. 2019 IL App (1st) 160986-U, ¶ 61. Moreover, the appellate court held that, even if defendant's statement was involuntary, any error in its admission was harmless based on the other evidence of his guilt. *Id.* ¶¶ 63-64.

¶ 51 Defendant appeals to this court. We granted the Center for Wrongful Convictions and The Innocence Project leave to submit a brief as *amici curiae* in support of defendant's position. Ill. S. Ct. R. 345 (eff. Sept. 20, 2010).

¶ 52                                    II. ANALYSIS

¶ 53      Defendant argues that the circuit court erred in refusing to suppress his inculpatory statement because it was obtained in violation of his constitutional and statutory rights. According to defendant, his statement should have been suppressed as involuntary where it was elicited through coercive conduct by police detectives.

¶ 54      In response, the State first asserts that defendant has forfeited review of the claim that his statement was involuntary. The State also contends that, forfeiture aside, denial of defendant's motion to suppress was proper because defendant's statement was voluntary despite the fact that he was prevented from making a phone call for 24 hours after his arrest. Lastly, the State posits that, even if defendant's statement should have been suppressed, its erroneous admission was harmless.

¶ 55                                    A. Forfeiture

¶ 56      We initially address the State's assertion that defendant forfeited review of the claim that his statement was involuntary. In general, a criminal defendant must raise an issue at trial and in a posttrial motion to properly preserve the error for review. *People v. Enoch*, 122 Ill. 2d 176, 186 (1988); see also *People v. McDonald*, 2016 IL 118882, ¶ 45. The failure to do so results in a procedural default, and the error will be considered forfeited. *Enoch*, 122 Ill. 2d at 185-86; *People v. McLaurin*, 235 Ill. 2d 478, 485 (2009). A claim of forfeiture presents a question of law, which we review *de novo*. *People v. Custer*, 2019 IL 123339, ¶ 17.

¶ 57      In this case, the State contends that defendant forfeited the argument that his statement was involuntary because the claim he asserts before this court was not presented to the trial court. In support, the State relies on *People v. Hughes*, 2015 IL 117242, ¶¶ 40-45, which held that the defendant had forfeited the claim that his statements were involuntary because the reasons supporting his argument on appeal were factually and legally distinct from the grounds for suppression asserted in the trial court.

¶ 58      According to the State, defendant's motion to suppress focused on allegations that the detectives improperly reinitiated interrogation after he had invoked his right to counsel and that his statutory right to a telephone call was violated. In the State's

- 13 -

view, defendant's focus on these assertions prevented full development of the record and precluded the circuit court from engaging in the totality-of-the-circumstances analysis that governs involuntariness claims. The State further contends that defendant "affirmatively disavowed" an involuntariness claim at the suppression hearing when his counsel acquiesced in the prosecutor's objection that the motion to suppress did not allege coercion.

¶ 59    We disagree with the State's contentions and find that the involuntariness claim has been preserved for review. First, the claim was raised in defendant's motion to suppress, which alleged that his statement was elicited in violation of his constitutional rights under the fourth, fifth, sixth, and fourteenth amendments to the United States Constitution (U.S. Const., amends. IV, V, VI, XIV). The issue was also included in defendant's posttrial motion, which challenged the denial of the motion to suppress, and it was raised in defendant's briefs before the appellate court and in his petition for leave to appeal to this court.

¶ 60    Second, the State's reliance on *Hughes* is misplaced because the reasons supporting defendant's suppression argument are not factually or legally distinct from the grounds asserted in the trial court. At the suppression hearing, defendant testified in detail as to the circumstances of his arrest and his 24-hour detention at the police station without access to an attorney or any means of obtaining counsel.

¶ 61    Defendant testified that, during his 24-hour detention, he was handcuffed to a wall in a locked interrogation room and was denied access to a telephone even though he invoked his right to counsel and repeatedly requested use of a telephone so he could arrange to speak with an attorney. After being held in the locked interrogation room for approximately 24 hours, he began to cry and pound on the walls and door. When the detectives reentered the room, they told him that he would have to "wait" for a phone call. Eventually, defendant agreed to make a statement.

¶ 62    Defense counsel repeatedly argued that defendant had invoked his right to counsel under *Miranda* but had no means of getting an attorney or contacting someone who could help him arrange for counsel. Defense counsel further argued that defendant's right to an attorney "is absolutely meaningless if he has no means of getting one."

¶ 63    Considering the evidence and arguments presented at the suppression hearing, we conclude that the factual and legal bases supporting defendant's argument have not changed. The crux of defendant's argument in the trial court and before this court is that his statement was rendered involuntary because he was detained for approximately 24 hours and deprived of the ability to contact an attorney even though he repeatedly invoked his right to counsel and requested access to a telephone in order to exercise that right.

¶ 64    The prosecutor was fully aware of the basis of defendant's claim, and she argued that "we have met our burden to show that [defendant's statement] was indeed voluntary." And the circuit court understood defense counsel's argument regarding defendant's "ability to access a phone call and attorney services" during the 24-hour period of detention. In light of these circumstances, the record does not support the State's contention that defendant has forfeited his involuntariness claim by asserting different factual and legal grounds.

¶ 65    Third, we disagree with the State's assertions that it was deprived of the opportunity to fully develop the record by presenting evidence that defendant's statement was voluntary and that the circuit court was precluded from engaging in the totality-of-the-circumstances analysis governing involuntariness claims.

¶ 66    The record establishes that the State cross-examined defendant regarding the circumstances of his detention and elicited defendant's acknowledgement that he had waived his rights under *Miranda* after reinitiating contact with the detectives. The State also presented the testimony of Detective Thompson, who substantially agreed with defendant's description of his arrest and detention. Thompson acknowledged that defendant was held overnight and into the following evening in a locked interrogation room while being handcuffed to a wall for at least part of that time. Thompson also admitted that defendant had invoked his right to counsel at the time of his arrest and at the police station but was not allowed access to a telephone to contact an attorney or a family member until after he had given his statement to the assistant state's attorney.

¶ 67    The State has not explained how it was hampered in opposing the motion to suppress, nor has it suggested what new evidence might have been presented to counter defendant's involuntariness claim. Consequently, we are unpersuaded by

the State's assertion that it was deprived of the opportunity to present a fully developed record on the voluntariness of defendant's statement.

¶ 68    Also, the record indicates that the circuit court engaged in the totality-of-the-circumstances analysis. In ruling on defendant's motion, the circuit court particularly referenced defendant's age and his employment by a catering firm. The court also considered the evidence of defendant's two encounters with the police regarding Gonzalez's murder. The court noted that in 2010, the year prior to his arrest, defendant agreed to speak with the police and was permitted to leave the station. In addition, the court addressed the duration of defendant's detention, his invocation of the right to counsel, and the fact that he had asked for a telephone call but was denied access to a telephone prior to making his inculpatory statement. Based on this record, we cannot say that the circuit court was precluded from considering the totality of the circumstances in ruling on the voluntariness of defendant's statement.

¶ 69    Fourth, the record does not support the State's contention that defendant had "affirmatively disavowed" his involuntariness claim. In making this argument, the State focuses on defense counsel's responses to two objections by the prosecutor asserting that defendant's motion to suppress had not alleged "coercion." Upon careful review of the record, we conclude that, considered in context, defense counsel's comments indicate only that the motion to suppress did not allege physical torture or abuse and cannot fairly be characterized as an affirmative disavowal of the claim that defendant's statement was involuntary.

¶ 70    As a final point, we note that the State concedes it did not raise defendant's alleged forfeiture of this issue in the appellate court. As this court has recognized, the forfeiture rule applies to the State as well as to the defendant in a criminal case. *People v. Holman*, 2017 IL 120655, ¶¶ 27-28; *People v. McKown*, 236 Ill. 2d 278, 308 (2010); *People v. Lucas*, 231 Ill. 2d 169, 174-75 (2008); *People v. Williams*, 193 Ill. 2d 306, 347 (2000).

¶ 71    In this case, defendant specifically argued in his brief to the appellate court that the erroneous admission of his involuntary statement was "preserved" by his counsel's "filing a pre-trial motion to suppress his statement on both statutory and constitutional grounds *** and by including the denial of the motion in a post-trial motion." The State did not respond to this argument or bring defendant's alleged

forfeiture to the attention of the appellate court. Also, the appellate court addressed the issue on the merits, apparently unhindered by the sufficiency of the record. In light of these circumstances, even if defendant had failed to preserve the involuntariness issue for review, we would not be inclined to excuse the State's forfeiture while enforcing it against defendant. Because we find that defendant's involuntariness claim has been preserved, we need not address his argument that the issue should be considered as plain error.

¶ 72                    B. Involuntariness of Defendant's Statement

¶ 73              1. *Constitutional Prohibition Against Involuntary Confessions*

¶ 74       Defendant argues that his statement should have been suppressed on the ground that it was involuntary and elicited through coercive conduct by the investigating police detectives. The State responds by asserting that defendant's statement was voluntary and, therefore, his constitutional rights were not violated even though he was held in custody and precluded from contacting an attorney for approximately 24 hours after his arrest.

¶ 75       A trial court's decision on a motion to suppress is reviewed under a two-part standard. *In re D.L.H.*, 2015 IL 117341, ¶ 46. Factual findings by the trial court will be reversed only if they are against the manifest weight of the evidence, but the ultimate legal determination as to whether suppression is warranted is reviewed *de novo*. *Id.*

¶ 76       The rule prohibiting the admission of an involuntary confession is rooted in the self-incrimination clause of the fifth amendment (U.S. Const., amend. V) and the due process clause of the fourteenth amendment (U.S. Const., amend. XIV, § 1). *In re D.L.H.*, 2015 IL 117341, ¶ 58 (citing *Missouri v. Seibert*, 542 U.S. 600, 607 (2004), and *People v. Richardson*, 234 Ill. 2d 233, 252 (2009)); see also *Miller v. Fenton*, 474 U.S. 104, 109-10, 116 (1985). To ascertain the admissibility of a confession under either amendment, courts consider whether the defendant's confession was voluntary and will exclude a confession that is involuntary. *Richardson*, 234 Ill. 2d at 252-53 (citing *Dickerson v. United States*, 530 U.S. 428, 434 (2000)); see *Miller*, 474 U.S. at 109-10; *People v. Davis*, 35 Ill. 2d 202, 205 (1966).

- 17 -

¶ 77        In *Miranda*, 384 U.S. at 444, the United States Supreme Court held that the admission of statements made by a suspect during a custodial interrogation is prohibited unless the prosecution demonstrates that the suspect has been warned of the right to remain silent, that any statement he does make may be used as evidence against him, and that he has the right to the presence of an attorney. *Miranda* explained that these warnings serve as procedural safeguards to protect against "incommunicado interrogation of individuals in a police-dominated atmosphere." *Id.* at 445. In addition, the Supreme Court explained that the warnings are necessary because such a "police-dominated atmosphere" is understood to create "inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely." *Id.* at 467. Therefore, "to combat these pressures and to permit a full opportunity to exercise the privilege against self-incrimination, the [suspect] must be adequately and effectively apprised of his right and the exercise of those rights must be fully honored." *Id.* A suspect may waive these rights, provided the waiver is made voluntarily, knowingly, and intelligently. *Id.* at 444.

¶ 78        In *Edwards v. Arizona*, the Supreme Court confirmed the principles set forth in *Miranda* and held that, once a suspect invokes his right to have counsel present during interrogation, all questioning must cease until counsel is present unless the suspect initiates further communication or conversations with police. *Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981). This rule is intended to "prevent police from badgering a defendant into waiving his previously asserted *Miranda* rights." *Michigan v. Harvey*, 494 U.S. 344, 350 (1990). *Edwards* explained that a suspect's waiver of the right to counsel, once invoked, may be shown where the State establishes that the purported waiver was knowing and intelligent under the totality of the circumstances, including the necessary fact that the suspect reopened the dialogue with police. *Edwards*, 451 U.S. at 486 n.9.

¶ 79                    2. *Voluntariness Is the Test for Admissibility of a Confession*

¶ 80        In deciding whether a confession is admissible, " '[t]he ultimate test' " is voluntariness. *Schneckloth v. Bustamonte*, 412 U.S. 218, 225 (1973) (quoting *Culombe v. Connecticut*, 367 U.S. 568, 602 (1961)). Where " 'the confession [is] the product of an essentially free and unconstrained choice by its maker,' " " 'it

may be used against him.' " *Id.* (quoting *Culombe*, 367 U.S. at 602). However, if the will of the defendant " 'has been overborne and his capacity for self-determination critically impaired, the use of his confession offends due process.' " *Id.* at 225-26 (quoting *Culombe*, 367 U.S. at 602). These principles have been adopted by this court in examining whether a statement has been made freely and without compulsion or inducement of any kind. *In re D.L.H.*, 2015 IL 117341, ¶ 58; *Richardson*, 234 Ill. 2d at 253.

¶ 81   The voluntariness of a confession depends on the totality of the circumstances of the particular case, and no single factor is dispositive. *In re D.L.H.*, 2015 IL 117341, ¶ 59. The relevant factors include the defendant's age, intelligence, background, experience, mental capacity, education, and physical condition at the time of questioning. *Id.* In addition, courts consider the legality and duration of the detention, the duration of the questioning, the provision of *Miranda* warnings, and any physical or mental abuse by police, including the existence of threats or promises. *Id.*; see also *Schneckloth*, 412 U.S. at 226; *Richardson*, 234 Ill. 2d at 253-54.

¶ 82                    3. *Police Coercion Renders a Confession Involuntary*

¶ 83   Police coercion is a prerequisite to a finding that a confession was involuntary. *Colorado v. Connelly*, 479 U.S. 157, 164 (1986). The Supreme Court has long held that police officers' use of physical abuse to coerce confessions from a suspect is prohibited because it is "revolting to the sense of justice" embodied in the Constitution. *Brown v. Mississippi*, 297 U.S. 278, 286 (1936). However, the Court also has proscribed more subtle forms of police coercion, including psychological pressure. See *Miranda*, 384 U.S. at 448 (holding that "the modern practice of in-custody interrogation is psychologically rather than physically oriented"); see also *Arizona v. Fulminante*, 499 U.S. 279, 287 (1991) (recognizing that " 'coercion can be mental as well as physical, and *** the blood of the accused is not the only hallmark of an unconstitutional inquisition.' " (quoting *Blackburn v. Alabama*, 361 U.S. 199, 206 (1960))); *Haynes*, 373 U.S. at 513-20 (holding that police officers' refusal to let a suspect contact his wife was coercive); *Lynumn v. Illinois*, 372 U.S. 528, 534, (1963) (finding that threatening a suspect with the loss of custody of her children was coercive); *Ashcraft v. Tennessee*, 322 U.S. 143, 153-55 (1944)

(holding that prolonged interrogation without rest or contact with individuals other than law enforcement officers was coercive).

¶ 84    Where the defendant challenges the admissibility of an inculpatory statement by filing a motion to suppress, the State bears the burden of proving, by a preponderance of the evidence, that the statement was voluntary. 725 ILCS 5/114-11(d) (West 2010); *Richardson*, 234 Ill. 2d at 254.

¶ 85                    4. *Lengthy* Incommunicado *Detention Is a Form of Police Coercion*

¶ 86    In support of the claim that his statement was involuntary, defendant places significant reliance on the Supreme Court's decision in *Haynes*, 373 U.S. 503, and on the statutory obligations imposed by section 103-3(a) of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/103-3(a) (West 2010)).

¶ 87    In *Haynes*, the defendant argued that his confession was involuntary because the police had held him *incommunicado* for a 16-hour period from the time of his arrest to the signing of the confession. *Haynes*, 373 U.S. at 504. His several requests that the police allow him to call his wife and attorney were uniformly refused, and he was repeatedly told he would not be permitted to contact counsel or his wife until he "cooperated" with the police and gave a written inculpatory statement. *Id.* During that time period, the defendant was not advised of his right to remain silent, that his answers might be used against him, or that he had a right to consult with an attorney. *Id.* at 510-11.

¶ 88    The Supreme Court held that the defendant's confession was "obtained in an atmosphere of substantial coercion and inducement" by the police (*id.* at 513), which rendered it an involuntary admission of guilt (*id.* at 514). The Court noted that the defendant "was alone in the hands of the police, with no one to advise or aid him," and he had no reason to question that " 'the police had ample power to' *** continue, for a much longer period, if need be, the incommunicado detention." *Id.* (quoting *Lynumn*, 372 U.S. at 534).

¶ 89    The Supreme Court further observed that, when the defendant was "[c]onfronted with the express threat of continued incommunicado detention and induced by the promise of communication with and access to family, [he]

understandably chose to make and sign the damning written statement." *Id.* The Court concluded that, in light of the "unfair and inherently coercive context in which made," the defendant's choice was not "the voluntary product of a free and unconstrained will" that due process requires. *Id.* Moreover, *Haynes* held that, "even apart from the express threat, *** incommunicado detention and interrogation" are tactics "used to extort confessions from suspects." *Id.*

¶ 90            5. *Illinois Statutory Right to Communicate With Counsel and Family*

¶ 91        Shortly after *Haynes* was decided, the Illinois legislature enacted section 103-3(a) of the Code. The version of section 103-3(a) that was in effect at the time of defendant's arrest and detention provides as follows:

> "Right to communicate with attorney and family; transfers. (a) Persons who are arrested shall have the right to communicate with an attorney of their choice and a member of their family by making a reasonable number of telephone calls or in any other reasonable manner. Such communication shall be permitted within a reasonable time after arrival at the first place of custody." 725 ILCS5/103-3(a) (West 2010).

¶ 92        The purpose of this provision is to allow a person being held in custody to contact family members to arrange for "bail, representation by counsel and other procedural safeguards that the defendant cannot accomplish for himself while in custody." *People v. Prim*, 53 Ill. 2d 62, 69-70 (1972).

¶ 93                        6. *Violation of Section 103-3(a) Is*
*Part of the Totality-of-the-Circumstances Test*

¶ 94        Defendant argues that the detectives' failure to comply with section 103-3(a) is one of the factors that must be considered in addressing the totality of the circumstances surrounding a suspect's inculpatory statement. We agree. The duration of a suspect's detention is among the factors included in the established totality-of-the-circumstances test. *In re D.L.H.*, 2015 IL 117341, ¶ 59. And because section 103-3(a) requires that a suspect be allowed access to a telephone "within a

reasonable time," the statute itself indicates that the length of the detention and the duration of custody prior to telephone access must be viewed together.

¶ 95    As a practical matter, a suspect cannot communicate with an attorney unless the police provide access to a telephone. Given the inherently coercive atmosphere of the police station, an extended delay in providing the means to speak with an attorney reduces a suspect's ability to avoid the psychological pressure of custodial detention. At some point, a prolonged delay becomes constitutionally problematic because it increases the likelihood that a subsequent statement is involuntary. See generally *People v. Willis*, 215 Ill. 2d 517, 538 (2005) (recognizing that "an extraordinarily long delay which itself raises the inference of police misconduct could, at some point, render any confession involuntary"). Thus, violation of section 103-3(a) must be considered in the determination of voluntariness because it effectively prevents a suspect from exercising his or her constitutional rights prior to and during custodial interrogation. See *Sanchez*, 2018 IL App (1st) 143899, ¶¶ 74-75 (citing *Haynes* and the violation of section 103-3(a) in holding that the defendant's inculpatory statement was involuntary).

¶ 96    Moreover, the burden of compliance on the State is slight. The terms of section 103-3(a) are honored by merely providing access to a telephone, which allows the suspect to arrange for counsel and inform family members of his or her whereabouts. The simple expedient of a telephone call serves the valuable purpose of protecting the suspect's rights and, absent evidence to the contrary, will not unduly hamper law enforcement officers in the execution of their duties. Thus, although no consequence for noncompliance is identified in section 103-3(a), the violation of its terms must be considered in determining whether a suspect's confession is voluntary under the totality-of-the-circumstances test. Doing so provides flexibility in application of the firmly established multifactor test and allows courts to balance the respective benefits and burdens of complying with the statutory requirements in any particular case.

¶ 97    We stress that this conclusion does not mean that we are creating an exclusionary rule when section 103-3(a) is violated. Rather, our holding that violation of the statute must be considered in ascertaining the voluntariness of an inculpatory statement strikes the appropriate balance between competing interests—the State's legitimate goal of effective criminal investigation and a

suspect's statutory right to consult with counsel after arrest and prior to or during interrogation.

¶ 98                    *7. A "Reasonable Time" Is Relatively Brief*

¶ 99          The phrase "within a reasonable time" is not defined in section 103-3(a). However, the committee comments to the statute reflect that the original draft of section 103-3(a) provided that a time period exceeding two hours would be *prima facie* unreasonable. 725 ILCS Ann., 5/103-3(a), Committee Comments— 1963, at 68 (Smith-Hurd 2006) (revised in 1970). The legislature ultimately deleted the two-hour reference to avoid confusion regarding whether it should be interpreted as mandatory rather than *prima facie*. *Id.* But these comments indicate that, in crafting section 103-3(a), the legislature intended that a suspect held in custody must be permitted to communicate with an attorney and family members within a relatively short period of time—such as a couple of hours.

¶ 100         Moreover, the statutory phrase "within a reasonable time" obviously has its limits. We need not declare a specific time limitation to conclude that a prolonged *incommunicado* detention is inconsistent with the terms of section 103-3(a). Admittedly, there may be a need for some flexibility to accommodate special circumstances in a police investigation, and courts should be mindful of any practical reasons or complexities that might cause a delay in compliance with the provision. However, given that the statutory obligation is slight—requiring only that the suspect be provided access to a telephone—the circumstances requiring a prolonged delay will be few and far between. If section 103-3(a) is to provide meaningful protection and serve its legislative purpose, the phrase "within a reasonable time" must be understood as referring to a time period that is relatively brief.

¶ 101                  *8. Section 103-3(a) Was Violated in This Case*

¶ 102         In light of the record presented here, we reject the State's assertion that the detectives complied with the terms of section 103-3(a) in this case. The length of defendant's detention cannot be divorced from the fact that the detectives denied his repeated requests for telephone access. Those two factors, considered together,

demonstrate that defendant was held *incommunicado* for approximately 24 hours with no means of contacting an attorney or a family member to arrange for counsel. By denying defendant telephone access, the detectives resolutely prevented him from exercising his constitutional right to counsel—a right that he consistently invoked from the moment of his arrest until he ultimately made the inculpatory statement 24 hours later.

¶ 103     We note that defendant's age, mental capacity, and physical condition do not necessarily suggest that he was particularly vulnerable to police coercion. However, those factors do not negate the influence or coercive impact of holding defendant, while handcuffed to the wall, in a locked interrogation room for 24 hours without any ability to communicate with the outside world. See *Haynes*, 373 U.S. at 514 (holding that "[n]either the petitioner's prior contacts with the authorities nor the fact that he previously had made incriminating oral admissions negatives the existence and effectiveness of the coercive tactics used in securing the written confession introduced at trial"). In addition, that impact is not mitigated by the fact that the detectives ceased questioning defendant after he invoked his right to counsel. The cessation of questioning does nothing to alleviate defendant's isolation and the inherently coercive nature of an *incommunicado* detention.

¶ 104     Although defendant immediately and consistently invoked his right to counsel over a period of 24 hours, the police prevented him from exercising that right. Therefore, he was left with two options: (1) give the detectives an inculpatory statement or (2) languish in the locked interrogation room, handcuffed to a wall, for an indeterminate period. When confronted with those choices, defendant's understanding and invocation of his *Miranda* rights was rendered meaningless. He was powerless to exercise those rights because the detectives impeded his only means to do so—a simple telephone call. In *Haynes*, the police expressly conditioned telephone access on defendant's inculpatory statement. *Id.* at 504. Here, the police demonstrated to defendant that they could hold him *incommunicado* for as long as it took for him to confess, and the refusal to allow defendant's request for telephone access in accordance with section 103-3(a) is an essential factor in the totality-of-the-circumstances calculus. Under such circumstances, defendant's exercise of the right to consult with counsel was not "fully honored." See *Miranda*, 384 U.S. at 467.

¶ 105                    9. *Police Procedures Do Not Negate*
                        *Constitutional or Statutory Protections*

¶ 106        It is also worth noting that, during his prolonged and *incommunicado* detention, defendant was never offered any explanation for the denial of telephone access. Rather, in response to his repeated demands for use of a telephone, defendant was merely told that he would have to "wait" to make a phone call. At the suppression hearing, Detective Thompson testified only that it was "procedure" that arrestees are not "normally" allowed to make any telephone calls until after booking. No statutory or constitutional basis for this "procedure" was presented in the circuit court or argued in the appellate court—and none has been offered to this court. Instead, the State posits that defendant might have been denied telephone access to prevent him from contacting a (nonexistent) codefendant or influencing witnesses. These suggested reasons are unpersuasive because they still would have existed when defendant was finally booked 24 hours after his arrest and because defendant consistently said he wanted a phone call to arrange for legal counsel. Thompson's explanation does not justify or excuse the delay in respecting defendant's rights. See *Willis*, 215 Ill. 2d at 538.

¶ 107        Moreover, even accepting Detective Thompson's testimony at face value, the fact that a "procedure" is "normal" does not mean that it is constitutionally permissible. Indeed, a routine procedure that systematically encroaches on constitutional rights is *more* insidious than an occasional infringement that occurs in unusual or infrequent circumstances. Telling a suspect that he must "wait" an indefinite period of time for telephone access is conceptually no different than denying him the right to consult with an attorney—at least during that undefined waiting period. Such a circumstance leaves open the possibility of exploitation by law enforcement officials. Illinois courts cannot allow police to take unfair advantage of their ability to control telephone access—which amounts to control over a suspect's ability to exercise the right to counsel. In that situation, police would have no incentive to comply with the terms of section 103-3(a) and the legislative purpose of the statute would be abrogated. The employment of a subtly coercive tactic under the guise of a routine procedure allows police to trespass on the rights shielded by *Miranda* and *Edwards*. We cannot condone such tactics, which are antithetical to our system of justice.

¶ 108    In addition, we reject the State's argument that defendant's statement was voluntary because there was no evidence that the 24-hour delay in booking him was an intentional tactic to induce a confession. This assertion reflects a fundamental misunderstanding of the underlying purpose of section 103-3(a)—which is to allow a person being held in custody to contact family members to arrange for "bail, *representation by counsel* and other procedural safeguards that the defendant cannot accomplish for himself while in custody." (Emphasis added.) *Prim*, 53 Ill. 2d at 69-70. As noted above, the State bears the burden of proving a defendant's confession was voluntary. 725 ILCS 5/114-11(d) (West 2010); *Richardson*, 234 Ill. 2d at 254. Delay for the sake of delay is unreasonable. See *County of Riverside v. McLaughlin*, 500 U.S. 44, 56 (1991) (listing examples of unreasonable delay in presentment for a probable cause determination). In this case, Detective Thompson offered no principled reason for preventing defendant from contacting an attorney or a family member for 24 hours. The prolonged and unexplained delay in this case violated the detective's statutory duty to provide defendant with access to a telephone within a "reasonable time" under section 103-3(a). The interplay of the length of defendant's detention and the denial of telephone access defeats the conclusion that his statement was voluntary.

¶ 109                10. *The State's Cases Do Not*
                *Justify Defendant's* Incommunicado *Detention*

¶ 110    The State attempts to counter defendant's involuntariness claim by asserting that his detention was "proper and not unduly long." In support, the State relies on *Willis*, 215 Ill. 2d 517, and *People v. Chapman*, 194 Ill. 2d 186 (2000). Yet, those decisions do not control here. Although both cases involved lengthy postarrest detentions, they are distinguishable in two important respects. First, they involved the question of whether the defendants' constitutional rights under the fourth amendment were violated by a delay in presentment for a judicial determination of probable cause—which implicates practical considerations that do not come into play when only telephone access is required. Second, neither of those defendants affirmatively invoked the right to counsel and demanded telephone access as a means of arranging for such consultation before making an inculpatory statement. Accordingly, *Willis* and *Chapman* are premised on a different footing and offer little guidance here.

¶ 111 The ruling in *In re G.O.*, 191 Ill. 2d 37 (2000), is similarly distinguishable. In that case, this court held that the 13-year-old defendant's confession was voluntary even though he was detained overnight and did not have an opportunity to confer with a family member or attorney. *Id.* at 56-57. In reaching that conclusion, the court rejected the need for a *per se* rule requiring suppression of a minor's inculpatory statement solely because he did not have the opportunity to consult a parent, guardian, or attorney prior to the interrogation. *Id.* at 55. However, the court also specifically noted that the defendant never requested to speak with his mother or another concerned adult, and the police never frustrated his ability to do so. *Id.* at 56.

¶ 112 Here, defendant immediately and consistently invoked his right to counsel, and he made repeated demands to use a telephone so he could contact an attorney or his mother so she could arrange for counsel. The police "procedure" requiring completion of the booking process before a suspect is permitted telephone access prevented defendant from contacting counsel or a family member before he made the inculpatory statement. As a consequence, *In re G.O.* does not control our analysis here.

¶ 113 In addition, the State posits that defendant's involuntariness claim must fail because the detectives complied with the mandates set forth in *Miranda* and *Edwards*, where they advised him of his rights, ceased the interrogation after defendant invoked his right to counsel, and returned to speak with him only after he initiated further conversation. The State points out that this court's decisions in *People v. Ramey*, 152 Ill. 2d 41, 57-59 (1992), and *People v. Terrell*, 132 Ill. 2d 178, 201 (1989), held that *incommunicado* detention for periods of six and eight hours, respectively, did not mandate suppression of a defendant's inculpatory statement.

¶ 114 Again, we find that the cases cited by the State are distinguishable. Here, defendant was held *incommunicado* at least three times longer than the defendants in those cases, and the defendant in *Terrell* did not indicate to police that he wanted to speak with an attorney or that he wished to remain silent.

¶ 115 The State also argues that the failure to comply with section 103-3(a) does not require suppression of a custodial statement because the statute does not impose any consequence or remedy for violation of its terms. But such a rule would

undermine the purpose of the provision and nullify the legislature's intent to enable a suspect in custody to exercise the right to counsel while in custody. Acceptance of the State's argument would create the anomalous situation where police officers are required by *Miranda* to warn a suspect of the right to counsel but then could prevent the suspect from exercising that right by denying him access to a telephone—which is precisely what occurred in this case.

¶ 116                    11. *The Recent Amendment of Section 103-3*
                *Supports the Conclusion That the Statute Was Violated Here*

¶ 117    In addition, we note that, during the pendency of this appeal, the General Assembly has amended section 103-3 as follows:

> "(a-5) Persons who are in police custody have the right to communicate free of charge with an attorney of their choice and members of their family as *soon as possible upon being taken into police custody, but no later than three hours after arrival at the first place of custody*. Persons in police custody must be given:
>
> > (1) access to use a telephone via a land line or cellular phone to make *three phone calls*; and
>
> > (2) the ability to retrieve phone numbers contained in his or her contact list on his or her cellular phone prior to the phone being placed into inventory." (Emphases added.) Pub. Act 101-652, § 10-256 (eff. July 1, 2021) (amending 725 ILCS 5/103-3).

See also Pub. Act 102-28, § 55 (eff. Jan. 1, 2022) (same).

¶ 118    Although the recent amendments to section 103-3 do not control here, they offer further guidance in ascertaining the legislative intent underlying the former provision and reflect the legislature's understanding that a suspect must be granted an opportunity to contact an attorney and family members within a relatively short time period—such as two or three hours. Despite the fact that the provision in effect when defendant was detained and tried does not impose a specific time limitation, we are compelled to reject the State's assertion that holding a suspect *incommunicado* for approximately 24 hours is a "reasonable time."

¶ 119    Considering the totality of the circumstances surrounding defendant's detention, we conclude that his statement was involuntary. Therefore, its admission was error and violated defendant's constitutional rights under the fifth and fourteenth amendments to the United States Constitution (U.S. Const., amends. V, XIV).

¶ 120                                    C. Harmless Error

¶ 121    Having determined that defendant's statement was involuntary, we lastly consider the State's assertion that the admission of that statement at trial was harmless. To establish that any error was harmless, the State must prove beyond a reasonable doubt that the result would have been the same absent the error. *People v. Jackson*, 2020 IL 124112, ¶ 127 (citing *People v. Thurow*, 203 Ill. 2d 352, 363 (2003)). In ascertaining whether an error is harmless, reviewing courts may (1) focus on the error to determine whether it might have contributed to the conviction, (2) examine the other evidence in the case to see if overwhelming evidence supports the conviction, and (3) determine whether the improperly admitted evidence is merely cumulative or duplicates properly admitted evidence. *People v. Stechley*, 225 Ill. 2d 246, 304-05 (2007).

¶ 122    This court has recognized that, because confessions are extremely probative, the improper "admission of an unlawfully obtained confession rarely is harmless error." *People v. St. Pierre*, 122 Ill. 2d 95, 114 (1988). However, we have also held that the erroneous admission of a confession may be harmless in certain circumstances. *People v. Mitchell*, 152 Ill. 2d 274, 327-28 (1992).

¶ 123    Defendant argues that the State failed to satisfy its burden of proving that the improper admission of his statement was harmless beyond a reasonable doubt. In response, the State asserts that, in light of the properly admitted evidence of defendant's guilt, any error in admitting his statement was harmless. Under the circumstances presented in this case, we agree with the State.

¶ 124    Apolonio Retama, defendant's friend of 15 years, testified that defendant had previously confessed to him in the fall of 2010. At that time, defendant admitted his involvement in the burglary of the bar, during which Gonzalez sustained the injuries that resulted in his death. According to Retama, defendant stated that he

was "going down" for murder. Although defendant did not identify the bar or its location, he explained that Jackson wanted to retaliate against the owner for ejecting him from the bar on a prior occasion. Defendant told Retama that they went to the bar after it closed and, upon encountering the bar's owner, Jackson repeatedly hit him with a pipe.

¶ 125     Retama's testimony was corroborated by Santos, who testified that defendant and Jackson were together on the night of the murder when they solicited his help in burglarizing O'Lanagan's bar. Santos described the proposed plan for the burglary and gave the police a description of "Andrew," Jackson's friend who was driving the car that night. Santos later identified defendant from a police photo array and at trial.

¶ 126     Retama's recitation of defendant's 2010 confession was further corroborated by the testimony of Kelfino, who described the incident in which Gonzalez ejected Jackson from the bar. In addition, the medical evidence corroborated Retama's testimony regarding defendant's confession and established that Gonzalez's injuries were consistent with being struck with a heavy, narrow object such as a pipe. And Jackson's cell phone records reflected that he was in the vicinity of the bar on the night of the murder and that he had been in contact with defendant around that time. Moreover, Retama and Santos were essentially unimpeached because defendant did not deny that he was with Jackson on the night of the murder. During closing argument, defense counsel conceded that defendant had participated in the burglary but argued that he was not accountable for the murder committed by Jackson.

¶ 127     Based on the record presented here, the substance of defendant's videorecorded confession was cumulative and duplicated other evidence that was properly admitted at trial. Thus, under the particular circumstances of this case, the result of the trial would have been the same if the confession had been excluded. We conclude, therefore, that the erroneous admission of defendant's statement was harmless beyond a reasonable doubt.

¶ 128     Although we find the error to be harmless in this case, we reiterate that a prolonged *incommunicado* detention disguised as "normal police procedure"

cannot be condoned.[3] And an unwarranted delay in providing the simple expedient of a telephone call takes on significant importance in evaluating the voluntariness of an inculpatory statement made after an extended period of *incommunicado* detention. Accordingly, law enforcement officials would be well advised to scrupulously comply with the requirements of section 103-3(a).

¶ 129                                    III. CONCLUSION

¶ 130        In sum, we hold that defendant's inculpatory statement was involuntary and should have been suppressed. However, the admission of that statement was harmless beyond a reasonable doubt. Therefore, we affirm the judgment of the appellate court, which affirmed the judgment of the circuit court.

¶ 131        Affirmed.

¶ 132        JUSTICE MICHAEL J. BURKE, specially concurring:

¶ 133        I agree with the majority that defendant's conviction should be affirmed. I disagree, however, with the majority's conclusion that defendant's inculpatory statement was involuntary and should have been suppressed. Although the majority gives lip service to the totality of circumstances test, the majority opinion effectively holds that a violation of section 103-3 of the Code of Criminal Procedure of 1963 (725 ILCS 5/103-3 (West 2012)) and the length of a detention are dispositive in determining whether a suspect's inculpatory statement was involuntary.

¶ 134        The majority correctly notes that the voluntariness of a confession depends on the totality of the circumstances of a particular case and that no single factor is dispositive. *Supra* ¶ 81. The majority also correctly sets forth the relevant factors to be considered, including the defendant's age, intelligence, background,

_____

[3]We note that this is not a new problem in Chicago. As the *amici* explain in detail and citing documentation, Chicago police officials across the city—and in particular at the Area North station—have been engaged in this type of behavior since 1959, and the practice persists despite the mandate set forth in section 103-3(a).

experience, mental capacity, education, and physical condition at the time of questioning. *Supra* ¶ 81. In addition, courts consider the legality and duration of the detention, the duration of the questioning, the provision of *Miranda* warnings (see *Miranda v. Arizona*, 384 U.S. 436 (1966)), and any physical or mental abuse by police, including the existence of threats or promises. *Supra* ¶ 81. Rather than consider each of those factors, however, the majority focuses solely on the fact that the police officers violated section 103-3 and did not allow defendant to make a telephone call during the 24 hours that he was detained. While I agree that a court can consider a violation of section 103-3 in considering the totality of circumstances, I disagree that a violation of section 103-3 trumps all other factors.

¶ 135    As the appellate court correctly observed, the violation of section 103-3, in depriving defendant access to a telephone, is "simply one of the factors to be examined when examining the totality of the circumstances that preceded the defendant's statement." 2019 IL App (1st) 160986-U, ¶ 61. The appellate court then considered the violation of section 103-3 in light of the totality of circumstances and concluded that defendant's statement was voluntary. *Id.* The appellate court specifically noted that

"defendant was [a] 25-year-old adult at the time he gave his statement. Although he had not been in serious criminal trouble prior to his arrest in the instant case, he did have some prior experience with the criminal justice system. He did not exhibit diminished mental capacity or physical infirmity. Moreover, although his pre-statement detention was lengthy, he was provided with food, drink, bathroom breaks, and contact lens solution. In addition, defendant was informed of his *Miranda* rights on several occasions and evidenced an understanding of those rights. Importantly, the officers abided by defendant's initial invocation of his right to an attorney and only conversed with him about the case when defendant, himself, reinitiated contact with police and waived his right to an attorney after he was again advised of his *Miranda* rights." *Id.* ¶ 62.

¶ 136    I agree with the appellate court's analysis of the totality of circumstances and its conclusion that defendant's statement was voluntary. The majority disposes of the preceding factors summarily, without analysis. The majority concedes that "defendant's age, mental capacity, and physical condition do not necessarily suggest that he was particularly vulnerable to police coercion." *Supra* ¶ 103.

Without further analysis, the majority decides that those factors "do not negate the influence or coercive impact of holding defendant, while handcuffed to the wall, in a locked interrogation room for 24 hours without any ability to communicate with the outside world." *Supra* ¶ 103. The majority further discounts the fact that the detectives ceased questioning defendant after he invoked his right to counsel, concluding that the "cessation of questioning does nothing to alleviate defendant's isolation and the inherently coercive nature of an *incommunicado* detention." *Supra* ¶ 103.

¶ 137        Contrary to the majority, I find all the factors considered by the appellate court to be significant in the totality of circumstances analysis. In a similar case from the Eleventh Circuit Court of Appeals, the defendants contended that their statements to the police were not voluntary and that they were unaware of their fifth amendment rights. *United States v. Ransfer*, 749 F.3d 914, 935 (11th Cir. 2014). The defendants in that case executed signed waivers of their *Miranda* rights, and the police interviewers also went over the *Miranda* waiver form and fifth amendment rights with each defendant. *Id.* The defendants claimed that the waiver and statements were not voluntary because each was held for more than 24 hours and was subject to coercion. *Id.* In rejecting the defendants' argument, the circuit court noted that the questioning did not last for 24 hours. *Id.* The interviews were as short as 2 or 10 minutes or as long as 75 minutes. *Id.* Further, as the magistrate judge found, the defendants were all offered food and restroom breaks throughout the course of their detention and, despite their relative youth, understood their fifth amendment rights before agreeing to waive them. *Id.* The circuit court found that, considering the totality of the circumstances, the defendants had voluntarily, knowingly, and intelligently waived their *Miranda* rights. *Id.*

¶ 138        Similarly, the Second Circuit Court of Appeals in *In re Terrorist Bombings of U.S. Embassies in East Africa*, 552 F.3d 177 (2d Cir. 2008), examined the totality of circumstances and found the circumstances surrounding the defendants' confinement did not render their statements involuntary. The defendants in that case filed motions to suppress, arguing that the conditions of their confinement rendered their *Miranda* waivers and subsequent statements involuntary, particularly the fact that the defendants were detained for 14 days *incommunicado*. *Id.* at 180-81. The circuit court disagreed, noting that, "[w]ithout minimizing in any way the potentially coercive effects of incommunicado detention lasting for fourteen days,

we must consider this fact as only one data point—albeit a significant one—in our totality-of-the-circumstances analysis." *Id.* at 214. The circuit court weighed the potentially coercive circumstances against the district court's findings of fact with regard to each defendant and concluded that the motion to suppress filed by each defendant was properly denied. *Id.* With regard to defendant Al-'Owhali, the circuit court stated:

" 'we cannot conclude that, because Al-'Owhali was detained incommunicado for fourteen days, the statements he made after waiving his *Miranda* rights were involuntary. The District Court's clear finding that the conditions of Al-'Owhali's detention were not coercive is buttressed by strong evidence of Al-'Owhali's personal intelligence and resilience; the humane treatment he received from his interrogators; and his own acknowledgement that a desire to come to the United States to air his grievances, and not coercion, caused him to speak with U.S. agents.' " *Id.*

¶ 139      Likewise, with regard to defendant Odeh, the circuit court agreed with the district court's "findings regarding Odeh's personal characteristics, the absence of oppressive interrogation methods, and his decision to speak with U.S. officials immediately upon encountering them" and concluded that, in light of those findings, Odeh's statements could not be attributed to the coercive effects of his *incommunicado* detention. *Id.* at 215.

¶ 140      In this case, as set forth by the appellate court, defendant testified at the hearing on his motion to suppress that the detectives stopped asking him questions and left the interview room whenever he said he wanted to speak to an attorney. 2019 IL App (1st) 160986-U, ¶ 11. The officers gave defendant something to drink at least five times and fed him chips at one point and a meal at another point. *Id.* ¶¶ 54, 62. The officers took defendant to the bathroom three or four times. *Id.* ¶ 11. The officers gave defendant cigarettes to smoke (*id.* ¶ 44) and also gave him contact lens solution because he was having trouble with his contacts (*id.* ¶¶ 11, 14, 54). There were times during his detention when defendant was not handcuffed. *Id.* ¶ 44. Defendant reinitiated contact with the detectives by pounding on the wall and crying, saying that he wanted to speak with them. *Id.* ¶ 11. The detectives told defendant that they needed to give him his *Miranda* warnings again because he had said he did not want to talk to them. *Id.* The detectives asked defendant if he was

reinitiating contact with them, and he said yes. I believe these factors support a finding that defendant's statement was voluntary and was not due to coercion stemming from a violation of section 103-3 and the length of defendant's confinement.

¶ 141　　　Lacking any testimony or evidence supporting a finding of coercion in this case, the majority finds the fact that section 103-3 was violated and the length of defendant's confinement alone established coercion, concluding that the "length of defendant's detention cannot be divorced from the fact that the detectives denied his repeated requests for telephone access." *Supra* ¶ 102. At the hearing on defendant's motion to suppress, however, defense counsel expressly denied that defendant was alleging coercion. Most importantly, defendant never testified at the hearing on his motion to suppress that he reinitiated contact with the detectives because he felt coerced or because he was told that he would remain confined until he confessed. Despite the majority's assurance that it is not "creating an exclusionary rule" (*supra* ¶ 97), its opinion does exactly that, in finding that defendant's statement was involuntary based solely on a violation of section 103-3 and the length of defendant's detention.

¶ 142　　　The majority cites *Haynes v. Washington*, 373 U.S. 503 (1963), in support of its finding that defendant's detention was coercive, rendering his statement involuntary. *Supra* ¶ 104. *Haynes*, however, is entirely distinguishable and highlights the difference between the due process violation in that case and the instant case. The defendant in *Haynes* asked to call an attorney and to call his wife but was told that he might be able to make a telephone call if he confessed, which he did after 16 hours in custody. *Haynes*, 373 U.S. at 504. Here, there were no conditions placed upon defendant's ability to make a telephone call. The detectives testified that the phone call was denied because it was procedure that arrestees were not allowed to make any telephone calls until after booking. 2019 IL App (1st) 160986-U, ¶ 16. Whether that procedure was proper or not, it does not rise to the level of coercion seen in *Haynes*. In addition, the *Haynes* defendant was never given his *Miranda* rights, while defendant in this case was repeatedly given his *Miranda* rights and the detectives ceased questioning him when he said he wanted to speak with a lawyer. Given these significant differences, *Haynes* does not compel a finding that defendant's statement was procured by coercion and thus was involuntary.

¶ 143　　　　Like the court in *In re Terrorist Bombings of U.S. Embassies in East Africa*, I find a violation of section 103-3 and the length of defendant's detention to be two data points in the totality of circumstances analysis, to be weighed against the other factors in the case. In this case, those data points do not outweigh the remaining factors surrounding defendant's confinement. Given defendant's age, intelligence, background experience, mental capacity, education, and physical condition at the time of his questioning, as well as the legality and duration of the detention, the duration of questioning, the provision of *Miranda* warnings, and any physical or mental abuse by police, I would find that defendant's statement was voluntary and was not obtained in violation of his constitutional rights.

¶ 144　　　　JUSTICE GARMAN joins in this special concurrence.