NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2023 IL App (4th) 220278-U

NO. 4-22-0278

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
February 16, 2023
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Sangamon County |
| JERMAINE J. DAVIS, | ) | No. 14CF194 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | John M. Madonia, |
| | ) | Judge Presiding. |

JUSTICE HARRIS delivered the judgment of the court.
Justices Steigmann and Zenoff concurred in the judgment.

**ORDER**

¶ 1    *Held*: Defendant's *pro se* postconviction petition set forth an arguably meritorious claim
of ineffective assistance of counsel and, as a result, the trial court erred by
summarily dismissing his petition at the first stage of postconviction proceedings.

¶ 2    Defendant, Jermaine J. Davis, appeals from the trial court's first-stage dismissal of

his *pro se* postconviction petition. He argues his petition set forth the gist of a constitutional claim

that his defense counsel was ineffective for failing to (1) investigate an insanity defense and

(2) present evidence during proceedings to suppress his statements to the police that he was denied

postarrest phone access in violation of his statutory and constitutional rights. Defendant also argues

that the trial court improperly failed to address his claim that his counsel was ineffective for failing

to investigate an insanity defense, depriving him of the right to have all of his postconviction

claims considered. Because we find defendant's *pro se* petition set forth an arguably meritorious

claim of ineffective assistance of counsel, we reverse the court's dismissal of his *pro se* petition and remand for further postconviction proceedings.

¶ 3                                    I. BACKGROUND

¶ 4        Following a jury trial in May 2017, defendant was convicted of two counts of first degree murder (720 ILCS 5/9-1(a)(1) (West 2012)) in connection with the deaths of Larry Grice and Andrea Pocklington and two counts of armed robbery (*id.* § 18-2(a)(2), (a)(4)). In June 2017, the trial court sentenced him to two terms of natural life in prison for the murders and two consecutive terms of 30 years in prison for each armed robbery count. On direct appeal, this court affirmed the trial court's judgment. *People v. Davis*, 2019 IL App (4th) 170431-U. In December 2021, defendant filed a *pro se* postconviction petition, which is the subject of this current appeal.

¶ 5        The underlying facts demonstrate that on December 31, 2012, Grice and Pocklington were found dead inside their Springfield, Illinois, residence. Grice had been shot twice in the head, and Pocklington had been shot once in the head and stabbed multiple times. During a series of police interviews conducted from February 7 to 10, 2014, defendant made increasingly inculpatory statements and ultimately confessed that he and another individual, Sancho Mitchell, committed the murders and stole from the victims.

¶ 6        Prior to his trial, defendant vigorously sought the suppression of his February 2014 statements to the police. In September 2015, he filed an initial motion to suppress through his counsel, arguing that his statements and alleged confession were involuntary because they occurred following his arrest, after "three days of interrogation," and after he had been denied "access to telephonic communications" and an attorney. In December 2015, defendant filed an amended motion to suppress his statements as involuntary, alleging he had been "compelled by his parole agent" to be interviewed; he invoked his right to silence during his February 7, 2014,

interview, and his right to silence was not honored by the police; he was arrested on February 7 and denied access to a telephone; and he was denied meaningful access to an attorney. In March 2016, defendant further amended his claims, filing a third motion to suppress his February 2014 statements. He argued the February 7 interview was a custodial interrogation during which he invoked his right to silence. Defendant alleged the detectives who interviewed him failed to scrupulously honor that right during not only the February 7 interview, but also his subsequent interviews on February 8 and 10.

¶ 7 In April 2016, the trial court conducted a suppression hearing. Video and audio recordings of defendant's February 2014 interviews were admitted into evidence, and the State presented testimony from Detective Ryan Sims of the Springfield Police Department. The evidence presented at the suppression hearing is set forth in detail in our previous decision and we do not repeat it here. Briefly stated, the evidence showed Detective Sims and Detective Steve Dahlkamp were assigned to investigate the December 2012 murders of Grice and Pocklington. On January 24, 2013, less than a month after the murders occurred, Sims spoke with defendant as a potential witness in the case. Defendant reported that he lived behind the house where the murders occurred. The evening before the victims were found dead, he observed two individuals approach and enter the house. He heard gunshots and screaming or yelling, and he then observed the two individuals leave the residence.

¶ 8 More than a year later, on February 7, 2014, Sims and Dahlkamp interviewed defendant about the murders for a second time. Sims testified the interview occurred after a gun believed to be the murder weapon was recovered and traced to defendant. Sims and Dahlkamp contacted defendant's parole officer, who contacted defendant on behalf of the detectives. Defendant drove himself to the police station in an acquaintance's car, where he was questioned

by the detectives in an interview room. The interview began at 11:30 a.m. and ended at 8:30 p.m. Defendant was initially informed that he was not under arrest, but he was read the *Miranda* warnings (see *Miranda v. Arizona*, 384 U.S. 436 (1966)).

¶ 9        During the course of the interview, defendant reiterated what he previously reported to the police in January 2013. After further questioning, he admitted to possessing the same type of gun that the police believed was used in the murders and asserted that he sold the gun to an individual named Black, who committed the murders. Upon being pressed about his involvement in the murders, defendant invoked his right to silence, asserting, "I want to use that right to stop talking." The detectives communicated further with defendant, who eventually admitted that he went to the victims' house with Mitchell and participated in an armed robbery. However, defendant maintained he fled the residence before Mitchell killed Grice and Pocklington. When questioned further about what happened inside the house and who had possessed a knife, defendant made a reference to obtaining an attorney and stated he did not "want to talk no more." At the conclusion of the interview, defendant was arrested and jailed on a charge of unlawful possession of a weapon by a felon.

¶ 10        On February 8, 2014, Sims and Dahlkamp interviewed defendant from 11:41 a.m. to 3:03 p.m. At the beginning of the interview, Sims reminded defendant that his rights still applied, and defendant indicated that he understood he could "stop talking whenever I choose to." During the interview, defendant admitted to seeing Mitchell shoot Grice but maintained that he left the victims' residence while Pocklington was still alive. After the detectives expressed doubt about defendant's story, defendant stated he was "done talking" and "ready to go home." Detectives informed defendant that the physical evidence showed two people committed the murders and that they knew he was involved. Defendant continued to deny that he killed anyone and maintained

that he left the residence after Mitchell shot Grice.

¶ 11        Defendant's February 10, 2014, interview with Sims and Dahlkamp occurred at the jail and was audio-recorded. At the outset of the interview, the detectives read defendant the *Miranda* warnings, and defendant stated that he understood them. During the interview, he initially repeated the same story that he told the detectives on February 8. However, he ultimately admitted that he was in possession of the gun when he and Mitchell entered the victims' residence. He stated he shot Grice in the back of the head while Mitchell killed Pocklington.

¶ 12        After defendant confessed, Sims and Dahlkamp transported him to the police station to give a final statement, which was audio- and video-recorded. Before questioning began, Sims stated he needed to advise defendant of his rights, stating "It'll be like the [fourth] time I've advised you what your rights are." Defendant replied, "Okay, actually five, this will be five." Sims then read defendant his rights, which defendant stated he understood before proceeding to make his statement. Defendant admitted that he and Mitchell went to the victims' house late on the night of December 30, 2012, to steal marijuana from Grice. He stated that after grabbing a duffel bag with marijuana, he shot Grice in the back of the head while Grice was lying on the floor. According to defendant, Mitchell shot and stabbed Pocklington.

¶ 13        At the suppression hearing, defendant's counsel made arguments consistent with the suppression claims set forth in defendant's March 2016 motion to suppress. He argued defendant was the subject of a custodial interrogation on February 7, 2014, when he invoked his right to silence and that the detectives failed to scrupulously honor that right. Counsel maintained that, as a result, all of defendant's February 2014 statements to the police should have been suppressed. The trial court took the matter under advisement. In June 2016, it entered a written order, finding defendant was not entitled to the suppression of any of his statements. The court

concluded defendant was not in custody at the time he invoked his right to remain silent but, even if he had been in custody, "he waived any right to remain silent by re-initiating contact" with the detectives.

¶ 14　　　　The same month the trial court entered its written order, it granted defendant's request to proceed in the matter *pro se* and appointed him standby counsel. In July 2016, defendant filed a "motion to rehearing of motion to suppress." He asserted his counsel failed to make arguments or present certain evidence in connection with his previous motion to suppress and that he wanted to "present additional, constitutional and *Miranda* violations to the court." At a hearing the same month, defendant argued that he had invoked his right to counsel "several hours into the interrogation" on February 7, 2014, but that questioning by the detectives "never ceased." Further, he asserted that portions of his statement, during which he "assert[ed] certain rights outside of the right to remain silent," were "taken out" of the recording of his interview. Defendant also complained that he was only given "partial *Miranda*" warnings on February 8, and that on February 10, questioning by the detectives continued after he had been held "*incommunicado*" and was "not being allowed access to a phone per Springfield Police Sergeant Von Behren [*sic*]." Finally, defendant maintained that he "re-requested" an attorney at the time of his February 10 interview, but one was not provided.

¶ 15　　　　On August 3, 2016, the trial court conducted a further hearing on defendant's *pro se* motion. Defendant presented only argument, asserting that he requested counsel during his February 7, 2014, interview and in the booking area of the jail immediately prior to both his February 8 and 10 interviews. Defendant argued that counsel was "never given to [him] during this whole period [he] was being held *incommunicado* where [he] was not allowed access to the phone per Sergeant Vonbehren [*sic*] of the Springfield Police Department or [when he] requested

it of the Sangamon County Jail."

¶ 16 Sims testified for the State. He recalled defendant making a reference to an attorney during his February 7, 2014, interview, but maintained it was not his understanding that defendant "was requesting an attorney be present at [his] questioning." Additionally, Sims did not recall defendant requesting the presence of an attorney at any point on either February 8 or 10.

¶ 17 The trial court denied defendant's *pro se* motion. It found defendant's reference to an attorney during his February 7, 2014, interview, did not provide the detectives with "sufficient notice that [defendant was] actually invoking [his] right" to counsel. The court concluded that defendant had been properly reminded of his *Miranda* rights prior to his interview on February 8. Further, it rejected defendant's claim that he invoked his right to counsel prior to his recorded interviews on February 8 and 10, finding defendant's assertion that he adamantly invoked his right to counsel did not "comport" with his failure to "say another word about it when [defendant was] back in being interviewed." The court also denied defendant's oral request to reconsider its ruling. The court did not address defendant's argument that he was denied phone access.

¶ 18 In February 2017, defendant moved for the reappointment of counsel to represent him, and the trial court granted his motion. In April 2017, defendant, with the aid of appointed counsel, filed a motion to reconsider the court's denial of his *pro se* suppression filing, asserting the evidence supported a finding that defendant invoked his right to counsel during his February 7, 2014, interview. Following a hearing the same month, the court denied the motion, stating its original ruling was correct.

¶ 19 As stated, defendant's jury trial was conducted in May 2017. The State's evidence included recordings of defendant's February 2014 interviews, which were published to the jury. It also presented evidence linking defendant to the murder weapon and a recorded statement from

Mitchell, which placed the blame for both murders on defendant. The State's evidence further demonstrated that Grice possessed a significant amount of counterfeit money before the murders and that defendant was found in possession of counterfeit money shortly after the murders occurred.

¶ 20        The jury found defendant guilty of both murders and both counts of armed robbery, and the trial court sentenced him as described. On direct appeal, defendant challenged the court's denials of his motions to suppress. *Davis*, 2019 IL App (4th) 170431-U, ¶ 3. He argued that he was in custody on February 7, 2014, when he invoked his right to remain silent, and the interviewing detectives failed to scrupulously honor that right. *Id.* ¶ 40. Defendant also argued that he unambiguously invoked his right to counsel during his February 7 interview, but detectives continued his interrogation without counsel present. *Id.* We affirmed the trial court's judgment. *Id.* ¶ 107.

¶ 21        Initially, this court agreed that defendant was in custody when he invoked his right to remain silent and that the interviewing detectives failed to scrupulously honor that right. *Id.* ¶ 87. As a result, we concluded the trial court erred by denying defendant's request for suppression as it related to his February 7 statements that were made subsequent to his invocation of his right to remain silent. *Id.* However, we also concluded that defendant's February 10 statements were admissible, noting (1) the lengthy period of time that elapsed between defendant's invocation of his right to remain silent and his February 10 interrogation and (2) that defendant had been read the *Miranda* warnings at the outset of each interrogation. *Id.* ¶¶ 93-94. Further, we found that although defendant made references to an attorney during his February 7 interview, we were "unable to say he unambiguously requested counsel." *Id.* ¶ 98. Thus, the court did not err in denying defendant's motion on that basis. *Id.* Finally, we held that any error in the admission of

defendant's February 7 and 8 statements was harmless beyond a reasonable doubt because those statements were "merely cumulative" of defendant's admissible February 10 statements and because "the other evidence in th[e] case, especially the February 10 interview, overwhelmingly support[ed] defendant's convictions." *Id.* ¶¶ 100-05.

¶ 22    As noted, in December 2021, defendant filed his *pro se* postconviction petition. Relevant to this appeal, he argued his defense counsel was ineffective for failing to pursue a "defense of mental health." Defendant also argued that his counsel provided ineffective assistance during his suppression proceedings by failing to present evidence of a notation on his "booking folder" that stated defendant was not permitted phone access following his February 7, 2014, arrest. According to defendant, after his arrest, he was taken to the Sangamon County Jail and placed in a "booking area cell," where he "noticed a note on his cell door which read, 'Do not allow phone access.' " Later, "[d]uring a court date," he noticed a notation on "his folder" that read, " 'Do not allow access to phone till Monday per sgt vonbehren (SPd) [*sic*].' " He asserted his counsel observed his folder and made an oral motion "to preserve the physical file," which the trial court granted. He also alleged that while incarcerated, he asked "jail officers to use the phone to call family, friends, and to try to get help with an attorney, due to earlier requesting one and not receiving one during police questioning." Defendant maintained he "informed detectives he was not being allowed to use the phone" and that he was "eventually overb[orne], and confessed." Defendant complained that his "[c]ounsel never presented the evidence of the folder in his pretrial motion to suppress evidence which violated [defendant's] communication rights."

¶ 23    Additionally, as a separate claim in his postconviction petition, defendant alleged his appellate counsel provided ineffective assistance on direct appeal by failing to challenge his February 10, 2014, statements to the police based on "the surrounding conditions of the ***

interview," including that he "was not allowed phone access to make phone calls to family and friends for help." He maintained that "[i]ncommunicado detention" was a violation of his rights and "being held *incommunicado*" from February 7 to 10 caused his will to be overborne during his police interviews.

¶ 24     To support his lack-of-phone-access claim, defendant attached to his petition a document with a handwritten notation that stated, "No phone until Monday Per (SPD) Sgt Vohnbereh [*sic*]." Attachments to his petition also included the affidavit of Richard A. VonBehren, a former detective with the Springfield Police Department who retired in December 2019. VonBehren averred as follows:

"4. After [defendant] was transported to the Sangamon County Jail on February 7, 2014, I did request that jail personnel restrict his telephone [access].

5. The purpose of the restriction was to prevent [defendant] from getting a message to Sancho Mitchell, another participant in the murders with which [defendant] was being charged.

6. After [defendant's] confession on February 10, 2014, I informed jail personnel that the Springfield Police Department did not require further phone restrictions.

7. Based upon a review of Sangamon County Jail inmate telephone records, I am informed and believe [defendant] did have access to and made telephone calls while in custody."

¶ 25     In March 2022, the trial court entered a written order, finding all of defendant's postconviction claims were "frivolous and patently without merit" and dismissing his petition. Regarding defendant's claim that his trial counsel was ineffective for not presenting evidence of

his restricted phone access, the court found defendant's petition did not arguably show ineffective assistance of counsel. In so holding, the court noted that defendant represented himself for a period of time during his suppression proceedings, including "at a re-hearing on his motion to suppress." It stated that while proceeding *pro se*, defendant "neither subpoenaed witnesses from the Springfield Police Department, nor from the Sangamon County Jail to inquire about his restricted phone status." The court declined to find that trial counsel's performance arguably fell below an objective standard of reasonableness when defendant "elected to forego investigation and pursuit of the same claim" while representing himself.

¶ 26        The trial court also found that defendant could not establish arguable prejudice. It noted this court's finding on direct appeal that at the time of his February 10, 2014, interview, defendant understood his rights and voluntarily waived them prior to confessing. The court further reasoned as follows:

> "Even if evidence from the jail booking folder would have supported [defendant's] contention that he was denied phone access initially, nothing about the substance of the jail folder would have resulted in a different analysis of the voluntariness of the ultimate confession on February 10, 2014, which occurred over 72 hours from the time [defendant] was initially taken into custody, and which came after detectives advised Davis of his *Miranda* rights at two separate times when that voluntary interview was conducted."

The court concluded evidence of the alleged restriction would not have impacted the "determination regarding the voluntariness of [defendant's] incriminating confessions of February 10, 2014."

¶ 27        This appeal followed.

¶ 28                                    II. ANALYSIS

¶ 29          On appeal, defendant argues the trial court erred by dismissing his *pro se* postconviction petition as frivolous and patently without merit. He contends his petition presented the gist of constitutional claims that his defense counsel was ineffective for failing to (1) investigate an insanity defense and (2) present evidence during his suppression proceedings that he was denied phone access after his arrest. Defendant also argues that the court failed to address his claim that his trial counsel was ineffective for not investigating an insanity defense, depriving him of his right to have that claim considered. He seeks remand for second-stage postconviction proceedings.

¶ 30          For the reasons that follow, we find defendant stated an arguably meritorious claim that his counsel provided ineffective assistance during his suppression proceedings, warranting further postconviction proceedings.

¶ 31                         A. The Post-Conviction Hearing Act

¶ 32          Under the Post-Conviction Hearing Act (Act), there is "a three-stage process for an imprisoned person to raise a constitutional challenge to a conviction or sentence." *People v. Hatter*, 2021 IL 125981, ¶ 22, 183 N.E.3d 136 (citing 725 ILCS 5/122-1 *et seq.* (West 2016)). "At the first stage, the circuit court reviews the petition independently within 90 days after it is filed and docketed." *Id.* When reviewing the petition, the court should consider its "substantive virtue rather than its procedural compliance." (Internal quotation marks omitted.) *Id.* The threshold for surviving a first-stage summary dismissal is low, and a petition should only be summarily dismissed "if it is 'frivolous or is patently without merit.' " *Id.* ¶ 23 (quoting 725 ILCS 5/122-2.1(a)(2) (West 2016)).

¶ 33          "A postconviction petition is frivolous or patently without merit if it has no arguable

basis either in law or in fact." (Internal quotation marks omitted.) *Id.* "A petition which lacks an arguable basis either in law or in fact is one which is based on an indisputably meritless legal theory or a fanciful factual allegation." *People v. Hodges*, 234 Ill. 2d 1, 16, 912 N.E.2d 1204, 1212 (2009). "An example of an indisputably meritless legal theory is one which is completely contradicted by the record." *Id.* "Fanciful factual allegations include those which are fantastic or delusional." *Id.* at 17.

¶ 34　　　　　"The allegations of the petition, taken as true and liberally construed, must present the gist of a constitutional claim." *Hatter*, 2021 IL 125981, ¶ 24. "[T]o survive summary dismissal, a petitioner is only required to include a limited amount of detail and need not present formal legal arguments or citations to legal authority." *Id.* "However a 'limited amount of detail' does not mean that a *pro se* petitioner is excused from providing any factual detail at all surrounding the alleged constitutional deprivation." *People v. Delton*, 227 Ill. 2d 247, 254, 882 N.E.2d 516, 520 (2008). A postconviction petition must include "some facts which can be corroborated and are objective in nature or contain some explanation as to why those facts are absent." *Id.* at 255. The trial court's first-stage dismissal of a postconviction petition is subject to *de novo* review. *Hatter*, 2021 IL 125981, ¶ 24.

¶ 35　　　　　　　　　　B. Ineffective Assistance of Counsel
　　　　　　　　　　　　During Suppression Proceedings

¶ 36　　　　　Claims alleging ineffective assistance of trial counsel are governed by the standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *Hodges*, 234 Ill. 2d at 17. Under the *Strickland* standard, "a defendant must show both that counsel's performance 'fell below an objective standard of reasonableness' and that the deficient performance prejudiced the defense." *Id.* (quoting *Strickland*, 466 U.S. at 687-88). "At the first stage of postconviction proceedings under the Act, a petition alleging ineffective assistance may not be summarily dismissed if (i) it is

- 13 -

arguable that counsel's performance fell below an objective standard of reasonableness and (ii) it is arguable that the defendant was prejudiced." *Id.*

¶ 37 Trial counsel's decision regarding whether to file a motion to suppress is generally a matter of trial strategy and is entitled to great deference. *People v. Gayden*, 2020 IL 123505, ¶ 28, 161 N.E.3d 911. Deficient performance may be found where counsel's failure to file a motion to suppress was the result "of a fundamental misjudgment" of the merits of a claim for suppression rather than a tactical decision (*People v. Peck*, 2017 IL App (4th) 160410, ¶ 38, 79 N.E.3d 232) or where counsel failed "to raise the strongest basis for *** suppressing the evidence" (*People v. Bloxton*, 2020 IL App (1st) 181216, ¶ 27, 178 N.E.3d 766). "To prove prejudice relative to the failure to seek the suppression of evidence, a defendant must show that the unargued suppression motion was meritorious and that there is a reasonable probability that the verdict would have been different without the excludable evidence." (Internal quotation marks omitted.) *People v. Eubanks*, 2021 IL 126271, ¶ 30, 190 N.E.3d 177.

¶ 38 "[A] conviction based 'in whole or in part, on an involuntary confession, regardless of its truth or falsity,' violates a defendant's constitutional rights." *People v. Hughes*, 2015 IL 117242, ¶ 31, 69 N.E.3d 791 (quoting *Miranda*, 384 U.S. at 464 n.33). "The test of voluntariness is whether the individual made his confession freely and voluntarily, without compulsion or inducement of any kind, or whether the individual's will was overborne at the time of the confession." (Internal quotation marks omitted.) *Id.* When weighing the voluntariness of a confession, courts "consider the 'totality of the circumstances,' including the defendant's 'age, intelligence, background, experience, education, mental capacity, and physical condition at the time of questioning,' along with the duration and legality of the detention." *Id.* (quoting *People v. Murdock*, 2012 IL 112362, ¶ 30, 979 N.E.2d 74). "No single factor is dispositive." *Id.* "Where a

defendant challenges the admissibility of an inculpatory statement through a motion to suppress, the State bears the burden of proving, by a preponderance of the evidence, that the statement was voluntary." *People v. Richardson*, 234 Ill. 2d 233, 254, 917 N.E.2d 501, 514 (2009) (citing 725 ILCS 5/114-11(d) (West 2000)).

¶ 39    In his *pro se* postconviction petition, defendant essentially alleged that his defense counsel was ineffective for failing to pursue the suppression of his statement to the police based upon evidence showing his postarrest denial of phone access. He maintained that such a denial violated his "communication rights" and resulted in his will being overborne during his February 2014 police interviews.

¶ 40    At the time of defendant's February 2014 statements, section 103-3(a) of the Code of Criminal Procedure of 1963 (Code of Criminal Procedure) (725 ILCS 5/103-3(a) (West 2014)) provided arrestees with a "right to communicate" by phone or other means with family members and an attorney. Specifically, that section stated as follows:

> "Persons who are arrested shall have the right to communicate with an attorney of their choice and a member of their family by making a reasonable number of telephone calls or in any other reasonable manner. Such communication shall be permitted within a reasonable time after arrival at the first place of custody." *Id.*

"The purpose of [the statute] is to allow a person being held in custody to contact family members to arrange for 'bail, representation by counsel and other procedural safeguards that the defendant cannot accomplish for himself while in custody.' " *People v. Salamon*, 2022 IL 125722, ¶ 92 (quoting *People v. Prim*, 53 Ill. 2d 62, 69-70, 289 N.E.2d 601, 606 (1972)). (We note section 103-3 has since been repealed (see Pub. Act 102-694, § 25 (eff. Jan. 7, 2022)), and the rights of an accused to communicate with family members and an attorney is currently set forth in section

103-3.5 of the Code of Criminal Procedure (725 ILCS 5/103-3.5 (West 2022)).)

¶ 41       The failure to comply with section 103-3(a) is one factor that must be considered when determining the voluntariness of a suspect's inculpatory statement. *Salamon*, 2022 IL 125722, ¶ 94. A section 103-3(a) violation "effectively prevents a suspect from exercising his or her constitutional rights prior to and during custodial interrogation." *Id.* ¶ 95. "Given the inherently coercive atmosphere of the police station, an extended delay in providing the means to speak with an attorney reduces a suspect's ability to avoid the psychological pressure of custodial detention." *Id.* "At some point, a prolonged delay becomes constitutionally problematic because it increases the likelihood that a subsequent statement is involuntary." *Id.* Although a violation of section 103-3(a) does not automatically render a confession or inculpatory statement inadmissible, it is "an essential factor in the totality-of-the-circumstance calculus." *Id.* ¶¶ 97, 104. Additionally, the requirement in section 103-3(a) that telephone communication must be permitted " 'within a reasonable time' " has been held to refer "to a time period that is relatively brief," *i.e.*, "a couple of hours." *Id.* ¶¶ 99-100.

¶ 42       In *Salamon*, the supreme court found both a violation of section 103-3(a) and that "[t]he interplay of the length of [the] defendant's detention and the denial of telephone access defeat[ed] the conclusion that his statement was voluntary." *Id.* ¶¶ 102-108. It relied on evidence showing that the defendant had "immediately and consistently invoked his right to counsel" and that he "was held *incommunicado* for approximately 24 hours with no means of contacting an attorney or a family member to arrange for counsel." *Id.* ¶¶ 102-04. It also noted the defendant made "repeated demands for use of a telephone" and was given no explanation for the denial of phone access. *Id.* ¶ 106. The court distinguished cases cited by the State in support of finding that the defendant's statement was voluntary, in part, because they did not involve circumstances where

the defendant had "affirmatively invoked the right to counsel and demanded telephone access as a means of arranging for such consultation before making an inculpatory statement." *Id.* ¶ 110.

¶ 43 Here, defendant claimed in his *pro se* postconviction petition that after his arrest on February 7, 2014, he observed notes on his "booking area cell" and "booking folder" that stated he was not allowed phone access. He maintained that he asked "jail officers" to allow him "to use the phone to call family, friends, and to try to get help with an attorney," and that he informed the interviewing detectives on February 8 that "he was not being allowed to use the phone." He attached supporting material to his petition, including (1) a purported copy of the notation on his "folder" that stated, "No phone until Monday Per (SPD) Sgt Vohnbereh [*sic*]" and (2) the affidavit of Richard A. VonBehren, a former detective with the Springfield Police Department, who acknowledged requesting defendant's phone restrictions. According to VonBehren's affidavit, on February 7, 2014, he requested that jail personnel restrict defendant's telephone access to prevent defendant "from getting a message to" his alleged accomplice. VonBehren's affidavit indicated defendant's phone restrictions were not lifted until after defendant's confession on February 10.

¶ 44 The record also contains support for defendant's claims. Not only does the record show that during his February 7, 2014, interview, defendant clearly invoked his right to silence and made some reference to obtaining an attorney, it also shows that he made requests for phone access on February 8 and 10. Specifically, at the conclusion of his February 8 interview, defendant asked the detectives if there was "anyway [he could] make some phone calls." Sims responded, "We'll work through a couple of those things *** Alright give me a minute, I've got to work through a couple of things. Phone issues." During defendant's February 10 interview, before he admitted to shooting Grice, defendant commented, "Y'all was supposed to help me make phone calls and get me my numbers." Detective Dahlkamp responded, "It will get done, I'm telling you,

it'll get done, but we can't rush something like this, it, I'm gonna tell you right now, you're going to court tomorrow."

¶ 45    As noted by the supreme court in *Salamon*, 2022 IL 125722, ¶ 104, a violation of section 103-3(a) is "an essential factor in the totality-of-the-circumstance calculus" for determining the voluntariness of a confession. When taken as true and liberally construed, defendant's allegations suggest a clear violation of section 103-3(a)—a denial of phone access over an approximately three-day period of time following his arrest and prior to his February 10 confession. Additionally, although defendant did not unambiguously request counsel during his February 7 interview, or (as the trial court found during his *pro se* suppression proceedings) immediately prior to his February 8 and 10 interviews, he did allege in his postconviction petition that he requested phone access from "jail officers" while in custody for the purpose of obtaining an attorney. Notably, defendant's allegations are not contradicted by the record, nor are his factual allegations fantastic or delusional.

¶ 46    We find that when defendant's postconviction allegations are taken together with the other evidence adduced during his suppression proceedings, including the interviewing officers' failure to honor his invocation of his right to silence, defendant has stated at least an arguably meritorious claim for the suppression of his February 10 confession as involuntary. As previously indicated by this court, defendant's February 10 statements were a significant part of the State's case against him. See *Davis*, 2019 IL App (4th) 170431-U, ¶ 102 (stating that "evidence in th[e] case, especially the February 10 interview, overwhelmingly support[ed] defendant's convictions"). Thus, if defendant's February 10 statements were suppressed, a reasonable probability arguably exists that the result of his trial would have been different. Because defendant's suppression claim based on the denial of phone access is arguably meritorious, it is

also arguable that his counsel was deficient for failing to pursue that claim with the trial court and that defendant suffered prejudice as a result.

¶ 47          On appeal, the State argues that defendant cannot successfully claim ineffective assistance of counsel because he "represented himself on rehearing of his motion to suppress"; argued to the trial court that he was improperly denied phone access after his arrest; and failed, himself, to support his argument with evidence of the notation on his "booking folder." It cites the supreme court's decision in *People v. Simpson*, 204 Ill. 2d 536, 565, 792 N.E.2d 265, 285 (2001), for the proposition that "a person proceeding *pro se* may not later complain that he received ineffective assistance of counsel."

¶ 48          However, in *Simpson*, the defendant challenged the effectiveness of his standby counsel during proceedings in which he chose to be entirely self-represented. *Id.* at 562. Those circumstances are distinguishable from the present case, where the record shows defendant elected to proceed *pro se* during only a portion of his pretrial suppression proceedings. The record also reflects that defendant was represented by appointed counsel both before and after his brief period of self-representation. His counsel had a duty to provide constitutionally effective representation during those periods of time, and, given the circumstances presented, we find defendant is not barred from claiming that the representation he received was ineffective.

¶ 49          The State also argues that defendant's claim must fail because he did not allege in his *pro se* postconviction petition how he was arguably prejudiced by his trial counsel's allegedly deficient performance. It contends that although defendant has argued on appeal that his confession was obtained as a result of a violation of his due process and statutory rights, he made no such similar contention in his *pro se* petition. We disagree.

¶ 50          As stated, "to survive summary dismissal, a petitioner is only required to include a

limited amount of detail and need not present formal legal arguments or citations to legal authority." *Hatter*, 2021 IL 125981, ¶ 24. In his *pro se* petition, defendant alleged a violation of his "communication rights" and suggested that his will had been overborne during his February 2014 police interviews. He set forth specific allegations of fact relative to those claims and attached supporting material to his petition. We find defendant's allegations were sufficient to meet the low threshold that is applicable to *pro se* petitioners at the first stage of postconviction proceedings.

¶ 51        The State next contends that "the intermittent lack of phone access was already raised" during suppression proceedings and addressed by this court on direct appeal. It suggests that "additional evidence that defendant's phone access was restricted was merely cumulative of the evidence already before the trial court and this Court." Again, we disagree. To support its contention, the State points to arguments by defense counsel and a discussion by this court on direct appeal regarding defendant's ability to access his phone during the course of his February 7 interview, which occurred *before* his arrest. A denial of phone access prior to an arrest does not implicate section 103-3(a), which plainly applies only to "[p]ersons who are arrested." 725 ILCS 5/103-3(a) (West 2014)). Further, evidence that defendant was denied phone access in jail for three days following his arrest was not cumulative of evidence that defendant's phone use was restricted before his arrest and while being initially interviewed on February 7. The issue of defendant's postarrest denial of phone access was never argued by defense counsel during the suppression proceedings, nor does the record reflect that it was addressed either by the trial court during the suppression proceedings or by this court on direct appeal.

¶ 52        Finally, we find no merit to the State's suggestion that defendant forfeited this issue by failing to raise it on direct appeal. In a postconviction proceeding, "issues that could have been raised on direct appeal, but were not, are forfeited." *People v. English*, 2013 IL 112890, ¶ 22, 987

N.E.2d 371. However, "[b]ecause an appellant generally is limited to the record, omitting a claim in the direct appeal will not result in a forfeiture of the claim in a subsequent postconviction proceeding if the record on direct appeal did not provide the means of raising the claim." *People v. Wrencher*, 2015 IL App (4th) 130522, ¶ 23, 31 N.E.3d 815. In this instance, defendant's ineffective-assistance claim, based on his counsel's failure to pursue suppression as a result of his postarrest denial of phone access, depends in large part on material that was outside the record on direct appeal. Such material includes defendant's alleged request for phone access to contact an attorney directed to "jail officers," the notation on his "booking folder," and VonBehren's affidavit. Under such circumstances, we decline to find forfeiture.

¶ 53    Here, defendant has presented an arguable claim that his defense counsel was ineffective for failing to pursue the suppression of his February 10 statements based on a violation of section 103-3(a) and his postarrest denial of phone access. As discussed, defendant alleged facts that, when taken as true and liberally construed, indicated he was denied phone access for approximately three days between his arrest and until after he fully confessed to committing the alleged offenses, and after he requested phone access from "jail officers" to contact an attorney. His claims are not contradicted by the record, nor are they fantastic or delusional. Accordingly, we find the trial court erred by summarily dismissing defendant's *pro se* petition as frivolous and patently without merit and that defendant is entitled to further postconviction proceedings. In so holding, we express no opinion regarding the ultimate merit of defendant's claim.

¶ 54                          C. Other Issues on Appeal

¶ 55    On appeal, defendant additionally argues that he is entitled to a remand for further postconviction proceedings because (1) his *pro se* petition set forth the gist of a constitutional claim that his trial counsel was ineffective for failing to investigate an insanity defense and (2) the

- 21 -

trial court improperly failed to address that claim when reviewing his petition. However, because we find defendant has presented an arguably meritorious claim that survives the summary dismissal stage, it is unnecessary to address these additional claims. In particular, we note that partial summary dismissals are not permitted at the first stage of postconviction proceedings. *People v. Rivera*, 198 Ill. 2d 364, 374, 763 N.E.2d 306, 311-12 (2001). "If a single claim in a multiple-claim postconviction petition survives the summary dismissal stage of proceedings under the *** Act, then the entire petition must be docketed for second-stage proceedings regardless of the merits of the remaining claims in the petition." *People v. Romero*, 2015 IL App (1st) 140205, ¶ 27, 36 N.E.3d 323. In this case, on remand, defendant's entire *pro se* petition must be docketed for second-stage proceedings.

¶ 56                                III. CONCLUSION

¶ 57        For the reasons stated, we reverse the trial court's first-stage dismissal of defendant's *pro se* postconviction petition and remand for second-stage proceedings consistent with the Act.

¶ 58        Reversed and remanded.