NOTICE
Decision filed 02/11/26. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2026 IL App (5th) 240622-U

NO. 5-24-0622

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Madison County. |
| | ) | |
| v. | ) | No. 21-CF-3768 |
| | ) | |
| LARRY D. LOVETT, | ) | Honorable |
| | ) | Kyle A. Napp, |
| Defendant-Appellant. | ) | Judge, presiding. |

PRESIDING JUSTICE CATES delivered the judgment of the court.
Justices Moore* and Barberis concurred in the judgment.

**ORDER**

¶ 1    *Held*:    The trial court did not err in denying the defendant's motion to suppress statements in that the defendant was not in custody during his interview, and the defendant failed to establish that his statements were not voluntarily made. Therefore, the trial court's judgment is affirmed.

¶ 2    After a bench trial, the defendant, Larry D. Lovett, was convicted of one count of first degree murder (720 ILCS 5/9-1(a)(2) (West 2020)), one count of first degree felony murder (720 ILCS 5/9-1(a)(3) (West 2020)), one count of attempted armed robbery (720 ILCS 5/18-2(a)(2) (West 2020)), and one count of unlawful possession of a firearm by a felon (720 ILCS 5/24-1.1(a) (West 2020)). The defendant was sentenced to the Illinois Department of Corrections for a total of

_____

*Justice Moore fully participated in the decision prior to his retirement. See *Cirro Wrecking Co. v. Roppolo*, 153 Ill. 2d 6 (1992).

1

75 years. On appeal, the defendant claims that the trial court erred in denying the defendant's motion to suppress statements he made during a custodial interrogation. The defendant also claims that the detectives failed to provide *Miranda*[1] warnings, engaged in illegal interview techniques, and refused to honor his invocation of his right to remain silent. Further, the defendant claims that while he was in an incapacitated state, police officers engaged in coercive tactics during questioning which led to the defendant providing involuntary statements. For the reasons that follow, we affirm.

¶ 3                                 I. BACKGROUND

¶ 4       On December 7, 2021, the defendant and a codefendant attempted to rob the victim, Andre Hutson. During the attempted robbery, the victim was shot with a taser and a gun. He died from his injuries. The defendant was also shot as the victim struggled to get the gun from the codefendant. The defendant left the scene of the shooting. An acquaintance of the defendant drove him to the emergency department at Barnes-Jewish Hospital in St. Louis, Missouri. The defendant was diagnosed with a penetrating injury to his abdomen and underwent surgery on the night of December 7, 2021, or in the early morning on December 8, 2021.

¶ 5       Following the shooting, the major case squad was called in to conduct the investigation. Detective Scott Mohrmann, employed by the St. Clair County Sheriff's Department, and Detective Marcy Barrows, employed by the Madison County Sheriff's Department, were members of the major case squad assigned to the investigation. On December 8, 2021, Barrows went to Barnes-Jewish Hospital to collect the defendant's clothes for evidence and to speak with the defendant. The hospital staff told Barrows that she would not be able to speak with the defendant at that time because he was in the intensive care unit. On December 11, 2021, Mohrmann and Barrows went

---

[1]*Miranda v. Arizona*, 384 U.S. 436 (1966).

to the hospital to interview the defendant regarding the shooting. The defendant remained in the intensive care unit due to his injuries. When the detectives made contact with the defendant, he told the detectives that he did not feel well and that he was tired. In response the detectives told the defendant that they would return the next day, to which he replied, "okay."

¶ 6 On December 12, 2021, the detectives returned to the hospital to interview the defendant. During this interview the defendant gave incriminating statements regarding his involvement in the attempted robbery and shooting of Hutson. When the defendant began giving details of his involvement, Mohrmann admonished the defendant of his *Miranda* rights. The detectives produced a *Miranda* waiver form that the defendant voluntarily signed. The interview continued and the defendant gave additional incriminating statements. Mohrmann recorded the interview using his cell phone. When Mohrmann ended the interview, he told the defendant that he would be back the following day. On December 13, 2021, Mohrmann and a detective with the Granite City Police Department returned to question the defendant regarding a different matter. At that time the defendant requested an attorney. The detectives respected the defendant's invocation of his right to an attorney and left. The defendant remained in the hospital until December 29, 2021.

¶ 7 On January 6, 2022, the defendant was indicted on five charges related to the shooting of Hutson. All three charges of first degree murder were based on the accountability theory. Count I charged the defendant with first degree murder in that the defendant, "or a person for whom he is legally accountable, without lawful justification, while armed with a firearm, and with the intent to kill Andre Hutson, shot Andre Hutson, thereby causing the death of Andre Hutson." Count II charged the defendant with first degree murder in that the defendant, "or a person for whom he is legally accountable, without lawful justification, while armed with a firearm, and while knowing such act created a strong probability of death or great bodily harm to Andre Hutson, shot Andre

3

Hutson, thereby causing the death of Andre Hutson." Count III charged the defendant under the theory of felony murder in that the defendant, "or a person for whom he is legally accountable, without lawful justification, while armed with a firearm, and while committing a forcible felony, Attempt Armed Robbery ***, shot Andre Hutson, thereby causing the death of Andre Hutson." Count IV was the underlying felony that charged the defendant in that he, "or a person for whom he is legally accountable, with the intent to commit the offense of Armed Robbery ***, performed a substantial step towards the commission of that offense in that he, while armed with a firearm, a 9 mm handgun, attempted to take property from Andre Hutson, by the use of force." Count V charged the defendant for unlawful possession of weapons by a felon.

¶ 8 Prior to trial, the defendant filed a motion to suppress statements that he made to law enforcement officers during his hospital admission in December of 2021. In the initial motion to suppress, the defendant argued that his physical condition rendered the *Miranda* waiver and his statements involuntary, unknowing, and lacking in understanding. The defendant later amended his motion to include the arguments that police did not initially read him *Miranda* warnings when he was in custody, that the police failed to honor his assertion of the right to silence, and that the police engaged in coercive techniques. The trial court held a suppression hearing that took place on three court dates over the course of a year. The State initially called Dr. Nneoma Wamkpah and Mohrmann.

¶ 9 Dr. Nneoma Wamkpah was the critical care attending resident who treated the defendant on December 12, 2021. The defendant was in the intensive care unit after having undergone surgery for a gunshot wound to the abdomen. During her testimony, Dr. Wamkpah testified to the defendant's mental condition, physical condition, and to the specific medications given to the defendant. Dr. Wamkpah stated that the defendant was in stable physical condition. His mental

4

acuity was alert and oriented, and his psychological status was normal. Regarding the defendant's medications, Dr. Wamkpah testified that the defendant was given five milligrams of oxycodone and regular Tylenol for pain management. She noted that the five-milligram dose was the starting dose for oxycodone. Dr. Wamkpah denied that the defendant received fentanyl.

¶ 10 Mohrmann testified that on December 11, 2021, he and Barrows went to Barnes-Jewish Hospital to speak with the defendant. Upon arrival the detectives introduced themselves and asked the defendant if they could speak with him. The defendant told the detectives that he was tired. The detectives told the defendant that they would be back the next day. The defendant did not voice an objection to the detectives coming back. The following day, December 12, 2021, the detectives returned to the hospital and reintroduced themselves. They asked to speak with the defendant, and he agreed. Mohrmann testified that the defendant was not handcuffed, he was not restrained by police, there were no officers posted at his door, and that the defendant was not in custody during the interview nor when they left. Mohrmann used his cell phone to record the interview. The initial video stopped abruptly when Mohrmann received a call. Once Mohrmann realized that the recording had stopped, he resumed the video recording. Mohrmann authenticated two video clips, People's exhibit 1 and People's exhibit 2, stating that the videos fairly and accurately depicted the interviews of the defendant on December 12, 2021. The two video clips of the interview, totaling approximately 40 minutes, were admitted into evidence. The State also offered transcripts of the video clips, and they were admitted into evidence with no objection. The video clips were played in open court.

¶ 11 People's exhibit 1 showed that Mohrmann was the first to question the defendant. When the recording began, the defendant stated that he was "not supposed to be taken out of here." Mohrmann replied, "You're not going anywhere, I can tell you that. You're safe." The detectives

5

informed the defendant that they were there to discuss the victim's murder and that this was the defendant's opportunity to tell his side of the story. The defendant asked what the difference was going to be if he had the taser and not the gun during the shooting. Mohrmann responded that it would make "a big difference." Mohrmann told the defendant that they had "everybody else's" side of the story but not his. In response the defendant said, "they all lie." After further conversation, the defendant admitted to his role in the attempted robbery of the victim, and he provided details of the struggle that ensued prior to the shooting of the victim. The second video clip, People's exhibit 2, began with Mohrmann reading the defendant his *Miranda* rights. Mohrmann testified that he decided to read the defendant his *Miranda* rights when the defendant began making detailed statements about his involvement. Mohrmann provided a *Miranda* waiver form and explained each warning. The defendant placed his initials next to each warning and then signed the form. After the waiver was signed the detectives and the defendant had a conversation about the defendant's current physical condition. The defendant mentioned concerns about being removed from the intensive care unit, to which Mohrmann replied, "You're not going with me today. That's a fact. So, if that is in the back of your mind, you don't have to worry about that because once I leave here, I am out." The defendant was further questioned about the shooting, and he provided additional details of his involvement.

¶ 12    At the conclusion of the State's evidence, the trial court found that a *prima facie* showing of voluntariness had been met. The burden shifted to the defendant to show that his statements were involuntary.

¶ 13    The defense called Barrows, Mohrman, and the defendant to testify. Mohrmann reiterated his earlier testimony regarding the December 12 interview. Barrows corroborated Mohrmann's account. The defendant testified that he felt severe pain all over his body on the days that the

6

detectives spoke with him. He testified about his injuries and his inability to get out of bed. In addition, the defendant testified that he was on "oxycontin and fentanyl." The defendant alleged that there was an off-camera conversation with Barrows and Mohrmann and that he told the detectives that he did not wish to speak with them. The defendant testified that Mohrmann mentioned that a taser was found at the scene with the defendant's fingerprints on it and that two other individuals, connected with the murder, were in custody. More specifically, the defendant testified that Mohrmann told the defendant that a codefendant had told the police that the defendant was the shooter. Mohrmann told the defendant that he needed to hear the defendant's side of the story. At the close of the defendant's testimony, the defense indicated that it had no additional witnesses. The State asked for a directed finding which the trial court denied. The State then called Detective Barrows.

¶ 14    Barrows testified that no facts of the case were mentioned or discussed prior to the start of the recorded interview on December 12. Barrows explained that there had only been a greeting and an introduction. There was no mention of other individuals in custody before the recording began. The State recalled Mohrmann who reiterated his previous testimony and denied confronting the defendant off camera. After hearing arguments from the State and defense counsel, the trial court took the matter under advisement.

¶ 15    On February 22, 2024, the trial court issued a 15-page order denying the defendant's motion to suppress. In its order, the trial court set out its factual findings and analysis. The trial court initially considered whether the defendant was in custody during the December 12 interview. In determining the custodial status of the defendant, the trial court considered the totality of the circumstances surrounding the interview in light of the factors set forth in *People v. Slater*, 228 Ill. 2d 137 (2008). These factors included: (1) the location of the interview, time length, mood, and

mode of questioning; (2) the number of police officers present; (3) the presence of family or friends present in the room during questioning; (4) whether formal arrest procedures were followed including show of weapons or force, physical restraints, booking, and fingerprinting; (5) how the questioned individual arrived at the place of questioning; and (6) the age, intelligence, and mental ability of the questioned individual. *Slater*, 228 Ill. 2d at 150.

¶ 16    First, the trial court found that the defendant was in the hospital, and that he was prevented from leaving due to his injuries. However, the trial court found that the hospital was a neutral setting and that the defendant was not restrained or prevented from leaving by the police. Further, the trial court found that the interview was "low-key" in that there were no raised voices or threats from the police, the interview lasted 46 minutes, and it was the police who ended the interview and asked if they could come back the next day. Second, the trial court found that there were no family members present but determined that this factor did not weigh heavily one way or the other in the defendant's custodial determination. Third, the trial court found that the police specifically told the defendant that he was not in custody, and that the defendant was not handcuffed, restrained, fingerprinted, or processed by the police. In addition, the trial court considered the defendant's understanding of his rights due to his previous criminal history, his federal probation status, and his familiarity with the police. The trial court further noted that the defendant was composed and showed little emotion during his questioning by the detectives. The defendant showed his understanding of his rights when he asserted his right to an attorney on December 13, 2021. After considering all of the above factors, the trial court determined that the defendant was not in custody when the detectives interviewed him.

¶ 17    Next, the trial court addressed the voluntariness of the defendant's statements. In doing so the trial court considered the following factors: the defendant's age, intelligence, education,

8

experience, and physical condition at the time of the interview; the duration of the interview; whether *Miranda* warning were given prior to the defendant's statements; whether physical or mental abuse was employed by the police; and the legality and duration of the detention. The trial court found that the defendant agreed to speak with the detectives and that he acknowledged his *Miranda* rights and signed a waiver. Further, the trial court found that the detectives were professional during the interview and that the police never used threats or physical coercion. At no time during the interview did the defendant indicate that he did not wish to speak with the police. In addition, the trial court noted that *Miranda* warnings are not required when a defendant is not in custody.

¶ 18    The trial court also addressed the defendant's argument that his medical condition prevented a voluntary statement. The trial court found that the State presented testimony from the interviewing detectives and Dr. Wamkpah that established that the defendant's medical condition did not render his statements involuntary. The trial court concluded that the defendant was not in custody and that his statements made on December 12, 2021, were voluntary. Therefore, the trial court denied the defendant's motion to suppress his statements made on December 12, 2021.

¶ 19    The case proceeded to a bench trial. The trial court found the defendant guilty of first degree murder (count II) and first degree felony murder (count III), attempted armed robbery (count IV), and unlawful use of a weapon by a felon (count V). The defendant was sentenced to the Illinois Department of Corrections on count II for 65 years to run consecutive to count IV and count V. In addition, the defendant was sentenced to 10 years to count IV and 10 years to count V to be served concurrently which resulted in a total sentence of 75 years. The defendant now appeals.

¶ 20                                    II. ANALYSIS

¶ 21     On appeal, the defendant claims that the trial court erred in denying his motion to suppress. The defendant argues that the trial court erroneously found that the defendant was not in custody at the time of the December 12 interview and therefore avoided addressing his claim that the detectives violated his *Miranda* rights. According to the defendant, the detectives violated his *Miranda* rights in that they failed to provide *Miranda* warnings before conducting a custodial interrogation; employed a question-first, warn-later technique; and refused to honor the defendant's invocation of his right to silence. The defendant also claims that his statements were involuntary because he was in an incapacitated state and that he was exploited by coercive police tactics during the interview. In response, the State claims that the trial court's denial of the defendant's motion to suppress his interview was substantiated and valid resulting in no error. Further, the State claims that the defendant's interview with the police was voluntary.

¶ 22     The applicable standard of review depends on the question raised on appeal. See *People v. Morgan*, 2025 IL 130626, ¶ 18. In reviewing the trial court's ruling on a motion to suppress, we give great deference to the trial court's findings of fact and credibility determinations and will reverse the court's factual findings only if they are against the manifest weight of the evidence. *People v. Logan*, 2014 IL 129054, ¶ 55. We review *de novo* the ultimate legal challenge to the trial court's ruling on whether the evidence should be suppressed. *Logan*, 2014 IL 129054, ¶ 55.

¶ 23                              A. Noncustodial Interview

¶ 24     The fifth amendment to the United States Constitution provides, "No person *** shall be compelled in any criminal case to be a witness against himself ***." U.S. Const., amend. V. The United States Supreme Court held that the fifth amendment applies to any place that a person encounters custodial interrogation. *Miranda*, 384 U.S. at 444. Custodial interrogation is defined as

10

"questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda*, 384 U.S. at 444. Warnings must be issued prior to questioning when an individual is faced with custodial interrogation. *Miranda*, 384 U.S. at 444. Thus, *Miranda* provides that prior to custodial interrogation, the person must be warned that he has a right to remain silent, that any statement may be used as evidence against him, and that he has a right to the presence of an attorney. *Miranda*, 384 U.S. at 444. A person may waive these rights, provided that the waiver is made voluntarily, knowingly, and intelligently. *Miranda*, 384 U.S. at 444. In determining whether a person is in custody necessitating *Miranda* warnings, the court will first consider the circumstances surrounding the interrogation, and then, given those circumstances, whether a reasonable person would have felt that he or she could end the questioning and leave. *Logan*, 2024 IL 129054, ¶ 59. The following nonexhaustive factors are relevant to determine whether the interrogation occurred in a custodial setting:

> "(1) the location, time, length, mood, and mode of the questioning; (2) the number of police officers present during the interrogation; (3) the presence or absence of family and friends of the individual; (4) any indicia of a formal arrest procedure, such as the show of weapons or force, physical restraint, booking or fingerprinting; (5) the manner by which the individual arrived at the place of questioning; and (6) the age, intelligence, and mental makeup of the accused." *Slater*, 228 Ill. 2d at 150.

No single factor is dispositive. Thus, a trial court should consider the relevant factors in light of the totality of the circumstances. *Logan*, 2024 IL 129054, ¶ 60.

¶ 25    In the case at bar, the defendant argues that he was subjected to a custodial interrogation and that the police violated his *Miranda* rights. To determine the custodial status of the defendant the trial court considered and weighed the relevant factors found in *Slater*, 228 Ill. 2d 137. The trial court ultimately concluded that the defendant was not in custody during his interview. The

11

interview was in a neutral setting, lasted approximately 46 minutes, two detectives were present, and the detectives conducted themselves in a calm and respectful manner. The defendant was not handcuffed or physically restrained. The defendant was not guarded by officers, and he was not subjected to police processing. The detectives only Mirandized the defendant after he began making incriminating statements. The detectives reviewed the *Miranda* warnings with the defendant, and he was given a waiver form that he voluntarily signed. The trial court found that the defendant did not have family members present during the interview, but it did not weigh heavily one way or another in its decision. The trial court considered the defendant's criminal history only as it pertained to the defendant's familiarity with the police, police procedures, and the defendant's understanding of his rights.

¶ 26     In addition, the trial court considered the defendant's claim that he was in severe pain and under heavy medication at the time of the interview. The trial court found, however, that the testimony by the intensive care unit surgical resident did not corroborate the defendant's testimony. Dr. Wamkpah testified that the defendant was on the starting dosage of pain medication and was normal in his responses. Notably, the defendant did not complain of pain during the interview. His only concern was that he did not want to be moved by the hospital staff out of the intensive care unit. The trial court also found that the defendant understood his rights because on December 13, 2021, a day after his interview, he asserted his right to an attorney.

¶ 27     After considering the circumstances and the relevant factors, the trial court found that the defendant was not in custody during the interview that he gave to the detectives. After a thorough review of the record, we conclude that the trial court's factual findings were not against the manifest weight of the evidence.

12

¶ 28    Next, we consider whether under these circumstances, a reasonable person would believe that they could end the interview. As stated previously, the defendant was not in handcuffs, he was not physically restrained, nor was he being guarded by the police. The defendant's inability to move was due to his injuries. There was evidence that the defendant declined to talk with the detectives the day prior to the December 12 interview. If the defendant had wished to remain silent, he could have exercised that right on December 12, but instead he agreed to speak with the detectives.

¶ 29    The defendant's arguments regarding *Miranda* violations rely on the underlying premise that the defendant was in police custody. Here, however, we have determined that the defendant was not in custody, therefore *Miranda* warnings were not required.

¶ 30                            B. Voluntary Statements

¶ 31    The defendant also challenges the trial court's finding that his statements were voluntary. To determine whether a confession is admissible, voluntariness is the test. *People v. Salamon*, 2022 IL 125722, ¶ 80. A confession must be given as a free and unconstrained choice without compulsion or inducement of any kind. *Salamon*, 2022 IL 125722, ¶ 80. The nonexclusive list of factors to be considered in assessing the voluntariness of a confession are the defendant's age, intelligence, background, experience, mental capacity, education, and physical condition at the time of questioning. *Salamon*, 2022 IL 125722, ¶ 81. No single factor is dispositive, rather the voluntariness of a confession depends on the totality of the circumstances surrounding a particular case. *Salamon*, 2022 IL 125722, ¶ 81. In addition, courts will consider the conduct by the police which includes any physical or mental abuse, any threats or promises, and the duration of the questioning. *Salamon*, 2022 IL 125722, ¶ 81. When a defendant challenges the admissibility of their statements given to the police by filing a motion to suppress, the State bears the burden of

13

proving by a preponderance of the evidence that the statement was voluntary. *Salamon*, 2022 IL 125722, ¶ 84.

¶ 32 The trial court found that the defendant was 38 years of age when he gave the statements in question to the detectives. The defendant was able to respond appropriately to questions asked by the treating physician and to the detectives. There is no evidence that the defendant suffered from mental problems or any intellectual deficit that would have affected his perception of his ability to terminate the interview. The defendant was also familiar with the criminal justice system.

¶ 33 Regarding the defendant's medical condition, the trial court found that the interview occurred several days after the defendant had undergone surgery for his gunshot wound. While the defendant was in the intensive care unit, he was stable and receiving medical treatment. The defendant testified that he was in severe pain and that "they was giving me fentanyl. They were giving me pills, OxyContin, and some other pills." Contrary to the defendant's testimony, Dr. Wamkpah, the defendant's treating physician, testified that the defendant was on the starting dosage of five milligrams of oxycodone along with Tylenol. She evaluated the defendant two times on December 12, 2021, and she stated that the defendant was alert, oriented, and that the defendant's psychological status was normal. Further, Dr. Wamkpah stated that the defendant was cooperative and that she was able to have a clear conversation with him.

¶ 34 The trial court additionally considered the manner and duration of the interview as it related to the voluntariness of the defendant's statements. On December 11, 2021, the detectives introduced themselves and they asked to speak with the defendant, but he said that he was tired and so they left. The defendant, however, testified that he told the detectives that he did not want to speak with them at all. On December 12, 2021, the detectives returned and the defendant agreed to speak with them. After the defendant started giving incriminating statements, the detectives

gave *Miranda* warnings, and the defendant voluntarily signed a *Miranda* rights waiver form. During the interview, the detectives were professional, calm, and respectful. The detectives never used threats or physical coercion. The defendant did not indicate that he wished to terminate the interview. In fact, it was the detectives who ended the interview. When Mohrmann went back the next day regarding a different matter, he read the defendant his *Miranda* warnings again and the defendant exercised his right to an attorney. Further, the testimony from Dr. Wamkpah indicated that the defendant's medical condition did not create a situation in which the defendant would furnish statements involuntarily.

¶ 35 The trial court found that under the totality of the circumstances, the conduct by law enforcement did not overcome the defendant's will to remain silent. In addition, the trial court found that the State met its burden in establishing that the medical condition of the defendant did not render his statements involuntary. There was no evidence of physical or psychological coercion and no evidence of improper tactics by the police. Therefore, we find that the trial court's factual findings are not against the manifest weight of the evidence as to the issue of voluntariness.

¶ 36 In sum, the trial court did not err in denying the defendant's motion to suppress. After a thorough review of the record, we find that the defendant was not in custody at the time of the interview. The defendant was given his *Miranda* warnings when he began making inculpatory statements, and he willingly acknowledged his rights by placing his initials next to each admonishment. As the defendant was not in custody at the time these warnings were given, they were not necessary. Contrary to the defendant's arguments, there were no coercive interview tactics and no evidence that the officers refused to honor the defendant's invocation of his right to remain silent. Therefore, the defendant failed to establish that his statements were not voluntarily made.

¶ 37                                III. CONCLUSION

¶ 38    For the reasons above, we affirm the trial court's judgment in denying the defendant's

motion to suppress.

¶ 39    Affirmed.